**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

_____
                                            :
ROBERT MALKANI,                             :        Civ. No. _____
                                            :
                        Plaintiff,          :
                                            :
v.                                          :        **JURY DEMANDED**
                                            :
GARTNER, INC.,                              :
                                            :        JUNE 7, 2024
                        Defendant.          :
_____:

**<u>COMPLAINT</u>**

Plaintiff Robert Malkani (hereinafter "Plaintiff") by and through his undersigned counsel Carey & Associates, P.C., brings this action against his former employer(s) Gartner, Inc. (hereafter "Defendant" or "Gartner").  Plaintiff alleges as follows:

**I.      PRELIMINARY STATEMENT**

1.      Plaintiff's Complaint asserts claims for: (1) discrimination based on sex pursuant to Title VII, 42 U.S.C. § 2000e (hereafter, "Title VII"); (2) discrimination based on sex pursuant to the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. §46a-60(a) (hereafter, "CFEPA"); (3) hostile work environment based on sex in violation of Title VII; (4) hostile work environment based on sex in violation of CFEPA; (5) discrimination based on age in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C.A. § 623 *et. seq.*("ADEA"); (6) discrimination based on age in violation of CFEPA; (7) illegal retaliation in violation of ADEA; (8) illegal retaliation in violation of Title VII, (9) illegal retaliation in violation of CFEPA; (10) negligent infliction of emotional distress; and (11) intentional infliction of emotional distress.

2.      This action is based on the bad faith actions taken by the Defendant employer to illegally retaliate against the Plaintiff for reporting unlawful discrimination and harassment at the hands

1

of his manager, a high-ranking officer in the Defendant Gartner.  The Defendant's efforts to silence the Plaintiff included his unlawful and retaliatory termination.

## II.    JURISDICTION, VENUE, & PARTIES

3.    This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4) based on Plaintiff's claims pursuant to 29 U.S.C.A. § 623 and 42 U.S.C. § 2000e. This Court has supplemental jurisdiction over Plaintiff's remaining claims, including those under the Connecticut Fair Employment Practices Act § 46a-60, et seq. and common law claims, which arise from the same case or controversy, pursuant to 28 U.S.C. § 1367(a).

4.    Plaintiff is and was at all relevant times a resident of the State of New York. The Plaintiff's work for the Defendant was performed at various locations as he worked remotely for the Defendant, a Connecticut based company.

5.    Defendant Gartner is a management consulting corporation located and headquartered in Stamford, Connecticut.

6.    The acts and omissions relevant to these allegations took place primarily in Connecticut and New York

## III.    PROCEDURAL PREREQUISITES

7.    Mr. Malkani filed a dual charge of discrimination on the basis of sex, age, and for retaliation with the Connecticut Commission on Human Rights and Opportunities (CHRO) and the United States Equal Employment Opportunity Commission (EEOC) on March 12, 2024, against the Defendant named in this action.

8.    On April 25, 2024, the EEOC issued a Notice of Right to Sue for EEOC No. 523-2024-01999.  The Notice of Right to Sue is attached hereto as Exhibit "A."

9.    On May 22, 2024, the CHRO issued a Release of Jurisdiction for CHRO No. 2420369.

The Release of Jurisdiction is attached hereto as Exhibit "B."

10.    All administrative prerequisites to the institution of this action have been satisfied.

**IV.    STATEMENT OF FACTS COMMON TO ALL COUNTS OF THE COMPLAINT**

11.    The Plaintiff is a male age 53.

12.    Until January 9, 2024, Plaintiff was employed in the Defendant's Global Sales

Strategy and Operations (GSSO) team as a Managing Vice President – leading the Sales Process

team. Plaintiff started in that role on October 1, 2021.

13.    In January 9, 2024 Plaintiff was notified that he was being terminated and his duties

given to younger and equally or less qualified and/or experienced female employees of Gartner.

14.    Plaintiff's termination was in substantial part because of his age (53) as an older

worker and in substantial part based on his sex which is male. Plaintiff's manager, Eric Pautz, a

white male (approximately 42 years old) expressed direct evidence of discriminatory bias against

Plaintiff based on his age on many occasions. Mr. Pautz further subjected Plaintiff to different

treatment than his similarly situated younger peers because of his age, ultimately terminating

Plaintiff based on his age on January 9, 2024.

15.    Prior to his termination, Plaintiff's manager, Mr. Pautz, further demonstrated direct

evidence of bias against Plaintiff based on his sex, which is male. Mr. Pautz engaged in disparate

treatment of Plaintiff based on his sex by favoring female colleagues and ultimately terminating

Plaintiff in favor of those female favorites.

16.    Mr. Pautz frequently expressed his strong preference for female subordinates, about

whom he made frequent, lewd, and suggestive comments to Plaintiff which were unwelcome.

17.    Additionally, Mr. Pautz made frequent sexual jokes and lewd innuendo directed at

Plaintiff. These putative "jokes" involved Mr. Pautz stating to Plaintiff that he (Plaintiff) was

skilled at performing or that he would perform certain explicit and lewd sexual acts with co-workers. These alleged "jokes" were not humorous but were humiliating, explicit, and degrading and created a sexually hostile work environment for the Plaintiff.

18.    In addition to disparate treatment based on Plaintiff's age and his sex, Mr. Pautz created a hostile and abusive work environment for the Plaintiff based on sex. Mr. Pautz engaged in a consistent pattern of making unwanted, highly explicit, and suggestive sexual comments and jokes about Plaintiff and other employees creating a sexually hostile work environment which was highly offensive and which adversely affected Plaintiff's work environment.

19.    Further, Plaintiff's termination constitutes illegal retaliation for reporting the discriminatory and hostile behavior of Mr. Pautz. When Plaintiff's initial reports of discrimination were ignored by his superiors, Plaintiff reported them to a Senior HR person on December 19, 2023. Plaintiff complained, again, that his manager was "being abusive and hostile." Plaintiff's role was "eliminated" three weeks after this complaint. In fact, Plaintiff's job duties had simply been given to younger and less experienced female colleagues.

20.    Plaintiff's qualifications prior to joining Gartner demonstrate that he was highly qualified for his position and that he was as highly qualified or more highly qualified and experienced than the younger female employees who were ultimately given Plaintiff's job responsibilities upon his termination.

21.    Plaintiff graduated from Dartmouth in 1992, summa cum laude, with a bachelor of arts degree in Economics and Engineering Sciences. After that Plaintiff graduated cum laude from Harvard Law School in 1995. Plaintiff practiced law as a corporate attorney at the law firm of Cravath, Swaine, and Moore in New York City from 1995 until 1997, where he advised large corporations on all aspects of mergers and acquisitions and securities offerings.

22.     In 1997, Plaintiff joined Credit Suisse in New York City as an investment banker, where he provided comprehensive investment banking services to Fortune 500 companies until mid-2000. In 2000, Plaintiff started a film production company formed to develop, finance, and produce feature films. During that time Plaintiff employed several hundred crew members across multiple film projects both domestically and internationally.

23.     In 2011, Plaintiff left the film business and joined a hedge fund in Connecticut called Bridgewater Associates, where he worked from 2011 to 2014. Plaintiff's role there was Associate Client Advisor. Plaintiff provided strategic investment advice to and managed relationships with the firm's largest and most important clients including sovereign wealth funds and pension funds. In 2014, Plaintiff left Bridgewater and joined Guggenheim Partners in New York City, where he worked from July 2014 to March 2015. Plaintiff's role was Head of Client Strategies (Guggenheim Fund Solutions).

24.     In March of 2016, Plaintiff joined BlackRock Inc., in New York, where he worked until July 2017 as a Senior Credit Strategist, Head of U.S. Liquid Leveraged Finance Product Strategy. Plaintiff drove overall product positioning for and growth of BlackRock's U.S. credit focused investment funds. Plaintiff led a team of eight product strategists covering a global suite of credit products with approximately $60 billion in assets under management.

25.     On March 28, 2018, Plaintiff joined Gartner Inc. as "Vice President and Head of Product Marketing" for the IT End-User Products team working for Ernie Bourassa (Senior Vice President, Global Product Management, approximately 39 years old). After one day of interviews, Mr. Bourassa said they'd love for Plaintiff to join Gartner where they are looking for "smart problem-solvers."

26.     Plaintiff's performance at Gartner was impeccable. In his first-year review at Gartner,

after nine months, he was told "Congratulations on getting off to a strong start of your Gartner career." Plaintiff was given an "S" (Fully Successful rating) having been told that since he was only there for a "stub period," anything higher would really be out of the norm even for great performance. Throughout that year Plaintiff had two direct reports.

27.    Plaintiff's responsibilities during this period include: (A) Inbound Sales Channel. Responsible for setting strategic direction for and overseeing all day-to-day operational aspects of Gartner's inbound sales channel as essentially a chief operating and strategy officer; (B) Overseeing growth in inbound sales channel new business of over 200% over a three-year period including headcount growth of 160% to 50 sales professionals across North America and Europe; (C) Proposed, initiated and managed all strategic initiatives including assessment of global expansion opportunities with detailed ROI analyses as well as day-to-day operational matters; (D) Launched and developed a partnership with Gartner's marketing team to optimize digital marketing efforts and marketing website effectiveness to maximize inbound sales channel new business; (E) Created a systematic approach to reacquiring former clients ("Lost Client Reacquisition Program") under the Inbound Sales Team which targeted former clients who had moved to new organizations; grew new business 250% over a three-year period; and (F) Product Marketing. Responsible for product marketing for Gartner's $2billion annual contract value portfolio of information technology end-user focused research and advisory products business.

28.    In 2019 Plaintiff hit his stride at Gartner and really began to understand the business and do great work. Plaintiff's full year 2019 performance rating was an "E" for Exceeds defined as "The associate consistently exceeds achievement of established goals, all relevant performance standards and expectations of core value behaviors. The associate's performance is above the majority of their team/department/organization." (This was the first of four straight years of "E"

performance for Plaintiff through calendar year 2022).

29.     2020 was another strong year for Plaintiff's performance and a year-end performance rating of "E". Plaintiff was also awarded restricted stock for his strong performance. In late 2020, Ernie's boss, Ken Davis, the overall head of product at Gartner, left the firm and was replaced by a new leader, Yvonne Genovese (Executive Vice President, Global Product Management). Given Yvonne's arrival, changes were made towards the end of 2020 into the beginning of 2021 across most of her organization.

30.     Ernie got promoted to oversee all of the technology products business (versus just IT End-User) and as a result in early 2021, Plaintiff got a new boss (Shib Chakraborty, Group Vice President, Global Product Management, approximately 47 years old) layered in between Ernie and himself). In addition, Plaintiff's role changed, officially as of approximately March 2021. Plaintiff no longer worked with the inbound sales channel and no longer led product marketing. Plaintiff's new role was a product manager leading the largest IT end user product line (Gartner for IT Leaders – which had been led by a colleague of the Plaintiff previously who was still on the team) – so Plaintiff was asked to take on something that was being led by a colleague at the time in a sign that he was a strong performer.

31.     Plaintiff was also asked to take over a team in India (seven people at the time) and turn it into a Center of Excellence which would provide various types of support to the product team. In addition, Plaintiff was asked to lead the market analysis and launch of a critical new "role-based product" (Gartner's first role-based product to be launched) for Data and Analytics leaders. All of these changes were characterized to Plaintiff at the time as a recognition of his strong performance and contribution to Gartner. The growth of Plaintiff's team to ten people was an indication of his stellar performance.

32.     Throughout 2021, Plaintiff primarily focused on the analysis of the market opportunity for the Data and Analytics leaders product and built out the capabilities of the India Team, needing to radically reorganize and upskill that team to essentially do completely different jobs. While the work was rewarding and Plaintiff did it well, he had very much loved and was passionate about the work he had done with the Inbound sales team.

33.     In roughly September 2021, Plaintiff spoke with a woman named Fei Fei (Group Vice President, Global Sales Strategy and Operations, approximately 35 years old) who used to be a peer working for Ernie on the product team but had earlier that year gone to work for Mr Jim Wartinbee (Senior Vice President, Global Sales Strategy and Operations, approximately 49 years old) who was leading the newly formed Global Sales Strategy and Operations (or GSSO) team within Gartner (at that time reporting up through to the CFO, Craig Safian). Fei reached out to say she was building out her team (Sales Process and Programs) on GSSO and was looking for someone to join her and lead the "Sales Process" part of the team helping to devise innovative long-term solutions to drive sales productivity and acting as the sales process business process owner for key technology implementations.

34.     Plaintiff had interviewed with Fei when he joined Gartner, knew her well, had a lot of respect for her and jumped at the chance to work for her.

35.     On October 1, 2021, Plaintiff joined Fei's team and was promoted to Managing Vice President as part of the move. The person leading Sales Programs, the other arm of Fei's team, was Ms. Magda Drobnicki, Vice President, Global Sales Strategy and Operations, approximately 36 years old.) Plaintiff's work in 2021 was split between working on the product team through September 2021 and then in GSSO under Fei from October 2021 until year end. As a result, Plaintiff's performance review was provided by Shib Chakraborty, Group Vice President,

Product Management, approximately 47 years old, Plaintiff's boss while in product. Plaintiff received an "E" rating for the third straight year.

36.     Further details on Plaintiff's responsibilities on the GSSO team from 2021 into 2022 and then through 2023, included acting as Head of Sales Process. Plaintiff was responsible for increasing sales productivity and improving the overall seller experience through the creation and implementation of innovative, long-term sales solutions that meet client retention and growth goals and deliver strong returns on investment.

37.     Fei was a very respected leader in GSSO and across Gartner. Fei showed a lot of faith in Plaintiff and asked him to lead important initiatives. Plaintiff worked with Fei from October 2021 until the summer of 2022 when she departed Gartner. During Plaintiff's time working with Fei, Plaintiff led an LRP or, Long Range Planning initiative which is a CEO originated strategic planning effort.

38.     When Fei left, Plaintiff had hoped Mr. Wartinbee would simply promote him to work directly for him on a permanent basis and possibly take over Fei's role, but instead he had Plaintiff's entire team report into another of his much younger direct reports (Gaurav Khandelwal, Group Vice President, Global Sales Strategy and Operations, approximately 35 years old). Gaurav was leading an analytics function within Jim's organization. The new combined group became "Sales Process, Programs and Analytics." After Gaurav took over the team, he said at one point to the Plaintiff: "I can see that working with you will be easy, you can just go get things done. It's a dream."

39.     Then, soon after, due to another of Jim's directs leaving in roughly July / August of 2023, Gaurav had to take on a different role reporting to Jim. He vacated his spot leading Sales Process, Programs and Analytics. As a result of Gaurav moving to lead another team under Jim,

Plaintiff reported directly to Mr. Wartinbee along with the two other people who had been temporarily reporting to Gaurav.  The people were Dave Egloff, Vice President, Sales Research and Advisory, approximately 47 years old and Magda Drobnicki (Vice President, Global Sales Strategy and Operations, approximately 36 years old. Plaintiff reported to Mr. Wartinbee for roughly five months at the end of 2022 into the very beginning of 2023. Plaintiff worked well with Mr. Wartinbee by all accounts and his year-end review reflected that successful working relationship.

40.     In approximately December of 2022, Gartner's CEO decided to have Jim, and the Global Sales Strategy and Operations Team he leads, report directly to him instead of up through the CFO. As a result, Mr. Wartinbee was promoted to being a member of the Operating Committee (or the "OC" as it's known within Gartner.)

41.     While Plaintiff's 2022 year was a mix of working for Fei, Gaurav, and Mr. Wartinbee directly for the last few months of the year, and despite Mr. Pautz (Plaintiff's most recent manager) becoming Plaintiff's manager by the time reviews were delivered for work done in 2022, Mr. Wartinbee himself gave Plaintiff his review in early 2023 – without Mr. Pautz on the call. Plaintiff received another "E" rating and a strong vote of confidence from Jim.

42.     This history of stellar performance would allegedly come to a screeching halt as Mr. Pautz would immediately begin to undermine the Plaintiff in his position and in his work.

43.     In early January 2023, Mr. Wartinbee informed Plaintiff of several changes to his organization, bringing in people from across Gartner to report directly to him and changing reporting lines for many people already reporting to Jim. The gist of the changes is that the CEO thought there needed to be more people with "selling experience" brought onto Jim's team. Mr. Wartinbee himself has no sales experience so the CEO told Mr. Wartinbee to surround himself

with more former Gartner sales leaders. That's what he did with a major reorganization in January 2023.

44.     Mr. Pautz was hired as one of those people brought in by Mr. Wartinbee and he was installed as Plaintiff's manager in January of 2023. Since taking over as Plaintiff's manager at that time, Mr. Pautz created an intimidating, hostile, and abusive work environment based on sex and based on Plaintiff's age since taking over as his boss in January 2023. Mr. Pautz was overtly hostile on numerous calls with just Plaintiff and on calls with other people and Plaintiff together, often cursing at Plaintiff with others on the call, and he treated Plaintiff very differently from other people on the team – in particular in comparison to the women on the team, all of whom are also younger than the Plaintiff. Mr. Pautz's treatment of Plaintiff was so bad that on more than one occasion Plaintiff's team urged him to go to HR because "Mr. Pautz is abusive towards you."

45.     In Plaintiff's conversation with Mr. Wartinbee when he informed Plaintiff of Mr. Pautz's arrival, he said he "had to bring in a former Gartner sales person even though Gene (our CEO) really likes you and thinks you can add value at Gartner in a lot of ways for a long time." But someone leading the Sales Process team should be a former seller according to Mr. Wartinbee. Though he wanted to have Plaintiff report directly to him, when Gene told him to hire Mr. Pautz, he obviously had no choice but to put Mr. Pautz in and walked Plaintiff through the logic. Plaintiff is a strong problem solver, strategic thinker, innovator, strong leader, strong communicator, has executive presence, etc. and Mr. Pautz knows the sales process and has relationships in sales. Mr. Wartinbee pitched the partnership as a win-win for everyone.

46.     The team that Mr. Pautz would be leading at that time after Mr. Wartinbee's broader realignment constituted Mr. Pautz and two direct reports – Plaintiff (leading Sales Process) and

Dave Egloff, a Vice President, Sales Research and Advisory, approximately 47 years old, a former research analyst who had joined the team just before Fei left, leading Sales Programs.

47.    Shortly after Mr. Pautz was announced as the new head of the team, Plaintiff and the team had an important quarterly call with the CEO Gene Hall, and Plaintiff was the lead presenter on the January 5, 2023, meeting. Mr. Pautz dialed in from vacation. The initiative was around Simplifying Selling and Plaintiff was the owner of the meeting and lead presenter – essentially the only presenter with various Operating Committee members chiming in. Jim, now Mr. Pautz's boss, let Plaintiff run the meeting as he had done many other times presenting to the CEO. The call lasted 90 minutes and Mr. Pautz listened to that meeting but was not an active participant.

48.    Shortly after that call, when Mr. Pautz was back from vacation, on or about January 10, 2023, Plaintiff had his first (virtual) get to know you meeting as Mr. Pautz lives in and works from St. Louis while Plaintiff lives in New York and works out of our Stamford, Connecticut Headquarters. On that call Plaintiff was very cordial but Mr. Pautz made an immediate comment about Plaintiff's age. Mr. Pautz said, "I'm sure you wanted this job. I totally get it. I think it was time for some fresh perspective." Mr. Pautz delivered the comment in a manner which indicated that it was an age-related reference as he would continue to frequently point out Plaintiff's age as one of the "older" members of the work group.

49.    Plaintiff was very surprised at the obvious ageist jibe during his first one on one conversation. This early remark would prove to be highly predictive of subsequent conversations as Plaintiff's work together progressed. Despite that comment, Plaintiff told Mr. Pautz that he was looking forward to working with him and that together they would do a lot of great things.

Mr. Pautz said his main mission is to help his people succeed, and to get them promoted within the organization.  Mr. Pautz said that he looked forward to helping Plaintiff grow at Gartner.

50.    During this call Plaintiff noted that he had been a strong performer at Gartner for the prior 5 years, receiving "E" ratings every year for the prior 4 years straight.  Plaintiff asked that Mr. Pautz let him know if there were any performance issues so that he could improve. Mr. Pautz said, "I know your track record and you can assume you're at an "E" unless I tell you otherwise." Plaintiff agreed to check in regularly and ask for an assessment – which Plaintiff did roughly a dozen times or so over the course of 2023 and in every instance Plaintiff was reassured that he was doing "E" work.

51.    Also, on that initial get to know each other call, after making the comment about "fresh perspective" putatively provided by the younger Mr. Pautz in the Senior position, he made a second veiled ageist reference to the Plaintiff when he said, "I can probably help you handle things in this new virtual world we're in." Plaintiff wondered why he was referencing technology as something Plaintiff would need help handling. It was the second comment during the call that struck Plaintiff as an odd reference to his age and or tenure or Plaintiff's supposed lack of familiarity with technology. These comments would continue throughout 2023.

52.    Plaintiff was offended at the obvious ageist remarks but did not wish to get off on the wrong foot. Plaintiff told Mr. Pautz that he had presented to the CEO probably a dozen times at Gartner and that he had a history of communicating and working with Senior Executives across his career for several decades. Plaintiff was a top performer but would always welcome feedback.

53.    Mr. Pautz did not waste any time in treating Plaintiff differently than his younger female peers. Plaintiff's team at the time Mr. Pautz took over consisted of five people and one open role

that Plaintiff had been told he could fill in the beginning of 2023. Plaintiff was to have a total of 6 people reporting to him. One of Mr. Pautz's first actions was to kill Plaintiff's open role despite Plaintiff's having secured buy-in for the position and the work the person would do at very senior levels from the two co-heads of sales, Joe Beck, Executive Vice President, Global Technology Sales, and Alwyn Dawkins, Executive Vice President, Global Business Sales, both of whom are members of the operating committee.

54.     When Mr. Pautz informed Plaintiff of this early move to diminish his role, Mr. Pautz said, "I know I said you could have the role but things change. In the new world you gotta' adjust. So try." Mr. Pautz's tone of voice and emphasis made it clear that he was bizarrely referencing Plaintiff's age and tenure as a professional again.

55.      The action of choosing to remove Plaintiff's additional role and shrink the size of his team was not something Mr. Pautz did to his other direct report, Dave. This treatment, along with the age-related comments began to make Mr. Pautz's motivations clear and Plaintiff was beginning to worry.

56.     Soon thereafter, Plaintiff directly observed further evidence of disparate treatment as compared to his younger female peers. Plaintiff had a low performer on his team that he inherited in the fall of 2022, who needed to be managed out of the firm. Before doing so Plaintiff asked Mr. Pautz if he was keeping the role once the person was gone, meaning Plaintiff would be able to refill the role. Mr. Pautz assured Plaintiff he would keep the role and be able to fill it.

57.      As soon as the employee was separated from Gartner, Mr. Pautz said he had changed his mind and that he would take the role for himself. When Plaintiff pointed out that Mr. Pautz had explicitly told him he would retain the role on his team Mr. Pautz said "Things change – gotta' flex – grow!" and he snapped his finger. Based on his mannerisms, tone, and body language,

which Plaintiff directly observed, this was a clear age-related insult directed at Plaintiff. Plaintiff was severely disappointed and concerned about what this said about Mr. Pautz's character and what it portended for Plaintiff's ability to work with Mr. Pautz once he had voiced his view so clearly during their first few interactions that he saw Plaintiff's age as a detriment he would need to "help" him with.

58.    The action of choosing to lie to Plaintiff about allowing him to fill a position on his team and further reduce his resources and position while allowing Plaintiff's female peers to grow their teams over the course of the year along with his age-related comments made Mr. Pautz's motivations clear. Mr. Pautz was trying to reduce the scope of Plaintiff's work intentionally because of his age.

59.    On January 31, 2023, Plaintiff had a one on one with Mr. Wartinbee. At that meeting he asked how Plaintiff was doing but didn't ask about how things were going with Mr. Pautz. Late in the call Plaintiff said he would like to mention some things about Mr. Pautz. Mr. Wartinbee said, "Oh like what?" Plaintiff said Mr. Pautz seems to be going around him and going direct to Plaintiff's team for different projects. Plaintiff complained it was strange and causing confusion. Mr. Wartinbee said, "Maybe he just likes a flat org." Plaintiff wanted to report the incidents of age-related comments and said, "There are other things…" Mr. Wartinbee interjected and shut down the conversation saying, "I think it's just Eric's [Mr. Pautz] way."

60.    It was obvious from the tone of voice and body language Mr. Wartinbee exhibited and which Plaintiff observed during that conversation, that Mr. Wartinbee would not accept any complaints about Mr. Pautz. Plaintiff was surprised that Mr. Wartinbee didn't care to receive any feedback about Mr. Pautz. Plaintiff was especially surprised since Mr. Wartinbee used to work in

HR at Gartner and Plaintiff would have thought he would have known that Gartner is required to permit adverse treatment by a supervisor to be reported and investigated if necessary.

61.    Mr. Wartinbee immediately retaliated against Plaintiff for just the attempted report of some of Mr. Pautz's initial outrageous behavior. Mr. Wartinbee immediately cancelled all future one on one meetings with the Plaintiff and they never had another one-on-one meeting until after Plaintiff provided written feedback about Mr. Pautz many months later in early November of 2023.

62.    In roughly late January / February 2023, Dave Egloff (a white male approximately age 47), left Mr. Pautz's team suddenly to go work for a different team also under Mr. Wartinbee. Plaintiff believes based on information obtained from colleagues that Mr. Pautz might have done something to precipitate the hasty exit of Mr. Egloff, an older male executive on the team as soon as Mr. Pautz took over. At the time of Mr. Egloff's departure from Mr. Pautz's team, Mr. Pautz said to Plaintiff, "I can't figure out what that guy does." And soon after that comment, Mr. Egloff was gone. Very briefly Plaintiff was Mr. Pautz's only direct report.

63.    Mr. Pautz soon brought on a younger female executive to replace the older Mr. Egloff. Mr. Pautz hired Ms. Drobnicki who is a woman approximate 36 years old, back to join the Sales Process and Programs team on February 14, 2023 – initially with no direct reports. With her return, Plaintiff was leading Sales Process and Ms. Drobnicki led Sales Programs taking over Mr. Egloff's former role.

64.    Ms. Drobnicki had worked for Ms. Fei when she was there but was moved over to an analytics function roughly at the start of the year (2023) when Mr. Wartinbee did his broader reorganization. At the start of Mr. Pautz's tenure he had two white male direct reports. One was moved to another team, briefly leaving just the Plaintiff as Mr. Pautz's only direct report. Then

Mr. Pautz brought back a younger white woman, then later hired another younger white woman, both of whom ultimately took over Plaintiff's duties. Then Plaintiff was terminated. Mr. Pautz's team then consisted of two white women both significantly younger than Plaintiff reporting directly to him. Upon information and belief, the basis of which are conversations Plaintiff had with colleagues, Mr. Pautz's prior team before he joined GSSO also had only white women.

65.    The new team as of February 2023 consisted of Mr. Pautz leading what was now known as the Sales Process and Programs team with two direct reports – Plaintiff and Ms. Drobnicki. Also, in late January and into February 2023 Mr. Pautz asked Plaintiff to review his team's main initiatives that were in flight before Mr. Pautz joined the team. This exercise turned out to be a prelude for further direct discrimination based on age by Mr. Pautz.

66.    Mr. Pautz acted on the information Plaintiff provided about his pending projects and initiatives by killing most of them and giving the others to Ms. Drobnicki. Mr. Pautz specifically referred to Plaintiff's work as: "McKinsey bullshit," and "trying to solve the universe" and said we needed to focus on practical things that our sales partners actually want.

67.    Mr. Pautz told Plaintiff directly that, "we can't do all that stuffy academic bullshit that has no impact. I know you like to run around thinking but it's time to get results. Ya' up for that?" The comment was delivered aggressively as Plaintiff directly observed in Mr. Pautz's tone and body language.  The reference to "McKinsey bullshit" was code for "outdated thinking" in this context. Mr. Pautz's meaning was clear in the context of his frequent explicit and implicit comments about Plaintiff's age and tenure.

68.    The tone and context of this conversation revealed that Mr. Pautz was also not very subtly asking whether Plaintiff could adjust to a "new" way of working as an old fashioned "McKinsey thumper." Plaintiff had never had anyone make any age-related comments before at

Gartner. So only a couple months into the job under Mr. Pautz, Plaintiff was beginning to worry about his constant narrative he seemed to be building around Plaintiff's age.

69.    Mr. Pautz's poor treatment continued into 2023. In roughly late February of 2023, Mr. Pautz had Ms. Drobnicki make changes to the Sales Pipeline stages description. Ms. Drobnicki came to Plaintiff to let him know about the changes. One of Plaintiff's team's major initiatives that Mr. Wartinbee had directly asked Plaintiff to lead was being the "single source of truth for how we sell and document it all in writing." Plaintiff had taken ownership over that process per Mr. Wartinbee during the previous year.

70.    It was highly unusual for an executive at Mr. Pautz's level to change a key sales process or function without consulting with or communicating with the team currently implementing the previously approved and mandated process. When Plaintiff asked that Mr. Pautz come to Plaintiff's team before simply changing the process because the team had been asked to be the keepers of the final source of truth on our sales process, Mr. Pautz became furious and said "I don't need to ask you anything about sales process, understand? I don't have to ask for your fucking permission about anything – ya' get it - I tell you what it is. Can you process that?"

71.    Mr. Pautz's constant mode of communication with Plaintiff included this frequent rhetorical questioning of whether Plaintiff was able to "get it" or "get with it" or whether Plaintiff was "up for this". Plaintiff was shocked at his demeanor when he shouted about whether Plaintiff could "process that"? This was another age related comment based on Mr. Pautz's tone of voice and body language which Plaintiff observed on the zoom call. Mr. Pautz was clearly referencing Plaintiff's age and whether Plaintiff still had the cognitive ability to understand what he was saying.

72.     Although Plaintiff was not in the room with Mr. Pautz, Plaintiff was intimidated by his threatening demeanor. Mr. Pautz's veins were sticking out from his neck and he had turned red. And at this point Mr. Pautz had already told Plaintiff he was "six foot four and a pretty big dude" on one of their calls. In response to Mr. Pautz's rage, Plaintiff said, "Of course, I simply meant it's good to keep us in the loop because we've been tracking changes to our sales process for the past year and a half and have a view on what everyone has aligned on."

73.     This negative and intimidating treatment of shouting in a threatening manner and bullying language was reserved for Plaintiff as the oldest male member of Mr. Pautz's team. The younger and female members of Mr. Pautz's team were not subjected to this treatment. The level of inexplicable hostility and humiliating treatment of Plaintiff by Mr. Pautz would only intensify.

74.     In roughly March of 2023, Mr. Pautz moved Aleksandra Sati, Director, Global Sales Strategy and Operations, approximately 40 years old, (a member of Plaintiff's team at the time) over to be under Ms. Drobnicki – Ms. Sati had worked under Ms. Drobnicki until Mr. Wartinbee's reorganization at the beginning of 2023 when Ms. Drobnicki was moved to another team and Ms. Sati was brought under the Plaintiff.  At that same time, Mr. Pautz sent a major initiative Plaintiff had been working on over with Ms. Sati to be handled by Ms. Drobnicki.

75.     At the time of this decision to gut Plaintiff's work, Mr. Pautz said, "This move makes sense, Magda [Ms. Drobnicki] has a lot of energy – this is good for the team."

76.     Mr. Pautz was once again making an ageist assumption of and comment about Plaintiff's energy level when he made a direct move to take one of Plaintiff's major initiatives and give it to Ms. Drobnicki, a younger female employee. Mr. Pautz further emphasized the age-relatedness of this otherwise inexplicable decision and stated clearly that the reason for this decision which greatly impacted Plaintiff's work and ability to contribute to Gartner was that Plaintiff's

replacement had more "energy" to keep doing the things Plaintiff had already been doing commendably.

77.     As of March 2023, only three months after Mr. Pautz had taken over the team and while making frequent age-related comments about Plaintiff, Mr. Pautz had removed three roles under Plaintiff's management along with one of Plaintiff's major initiatives. Plaintiff was being systematically stripped of duties and responsibilities amidst circumstances which clearly indicated that Mr. Pautz had some perception of Plaintiff as "out-dated," "low-energy," "unable to change," "unable to understand instructions," and unable to adapt to the "virtual world." All of those criticisms both express and implied were notable in Mr. Pautz's tone of voice and body language which Plaintiff observed directly and which conveyed the meaning of his comments.

78.     Around this time in March of 2023, Mr. Pautz began to make his preference for working with young female executives clearly known to Plaintiff. Mr. Pautz began to make unwelcome sexually charged references, jokes, and comments about his sexual interest in certain younger female colleagues. Mr. Pautz also directed sexually explicit and rude jokes about Plaintiff directly. This unwanted and often shocking sexual innuendo and joking, created a work environment which was oppressive and hostile for Plaintiff as he did not want to engage in the lewd and inappropriate sexual banter initiated by Mr. Pautz.

79.     On March 21, 2023, there was a meeting entitled "Aligning on Sales Process" which included Mr. Wartinbee, Mr. Pautz, Kate Elsam, Joe Dal Santo and Jamie Marshall. The group discussed the sales process and how to incorporate it into sales training. The next day on March 22, 2023, Plaintiff set up a meeting with Mr. Pautz entitled "Our Approach to getting things done" to discuss how they should work with other teams like Ms. Elsam's. Only Mr. Pautz and

Plaintiff were on the call. In response to Plaintiff's question about working with Ms. Elsam, Mr. Pautz said "She's a wonderful human…and I would get wonderful all over that!"

80.     The tone of voice of Mr. Pautz while he said this, which Plaintiff observed on the call, made clear this was intended to be an obvious inappropriate sexual reference about Ms. Elsam. Plaintiff was speechless and didn't even respond. This trend of frequent unwanted and inappropriate sexual references would continue to make Plaintiff's work environment disturbing and unreasonably stressful due to the outrageous sexually explicit nature of Mr. Pautz's conduct and words.

81.     Mr. Pautz continued to treat Plaintiff differently and less-well than younger and/or female colleagues. The next example was on the occasion of an important meeting with the CEO in April 2023. It's the type of meeting Plaintiff had led many times before Mr. Pautz became his manager and Plaintiff was prepared to do so again. As the meeting date approached, Plaintiff had been working with Mr. Pautz on preparing materials and roles for the call with Plaintiff having a large role along with Mr. Pautz.

82.     However, Plaintiff left for vacation a week before the meeting and while Plaintiff was out, Mr. Pautz asked Mr. Josh Matson (Sr. Director, Global Sales Strategy and Operations, approximately 35 years old), who was a member of Plaintiff's team, to call Plaintiff while he was on vacation and tell him that he wasn't needed for the meeting with the CEO. Mr. Matson was instructed to tell Plaintiff he would have no role whatsoever even though it was the type of meeting Plaintiff would have normally led. Further, in the days leading up to Plaintiff's vacation, Mr. Pautz and Plaintiff had discussed his role – which was to be significant.

83.     This meeting was important to Plaintiff as an executive as it featured discussion of the seller experience survey – a signature piece of work from Plaintiff's team. Mr. Matson pushed

back and said to Mr. Pautz, that he thinks Mr. Pautz should tell the Plaintiff if he is cutting him out of this meeting. Mr. Pautz confirmed over text to Plaintiff there was no role for him. Plaintiff was shocked and dismayed. Plaintiff related to his sister and brother-in-law that his boss was trying to cut him out of critical work with the CEO. Plaintiff also reported to them that Mr. Pautz was making constant direct and implied comments about Plaintiff's age and cutting Plaintiff's team size. Plaintiff was very concerned.

84.    The CEO meeting ultimately got postponed. When Plaintiff got back and asked Mr. Pautz about why he cut Plaintiff out of the meeting Mr. Pautz said: "Mr. Matson seems great. I just thought a jolt of energy in the meeting would be good." Again, Mr. Pautz made direct reference to Plaintiff's age by making a personnel move to remove a project from Plaintiff's purview and give it to a much younger colleague, along with the explanation that more "energy" was needed on the project. This was an opportunity for a high-visibility presentation to the CEO and would have an impact on how Plaintiff's work was seen by upper management.

85.    This action of repeatedly giving job duties to younger or female subordinates or colleagues was not done to the female peers on the team. This conduct was reserved for Plaintiff as the oldest male on the team.

86.    For the next few months, roughly March through June 2023, Plaintiff faced a number of challenges working with Mr. Pautz. Mr. Pautz had already made many explicit and veiled references to Plaintiff's age, energy level, and how that might impact Plaintiff's ability to lead the team. Based on Plaintiff's information and belief this never happened to any of the younger members of the team – whether Mr. Pautz's direct reports or younger members working directly for Plaintiff.

87.     Further, during this time period of March to June of 2023, Mr. Pautz would further treat Plaintiff with disrespect reserved solely for him by going to his direct reports and asking for work without telling the Plaintiff. This would obviously cause issues because Plaintiff's reports would then need to come to Plaintiff for help, but it wasn't clear to Plaintiff how best to help since Mr. Pautz made it clear he wanted to work with Plaintiff's team directly without his involvement. This happened on numerous occasions with Michael Cassidy on Plaintiff's team. Also, on more than one occasion in projects involving Mr. Pautz and Plaintiff it was unclear what the broader team's role was and what the roles were between Mr. Pautz and Plaintiff.

88.     On multiple occasions, Plaintiff asked Mr. Pautz to provide more clarity and he said he'd work on it but wouldn't actually do anything. Plaintiff's feedback fell on deaf ears. In fact, Mr. Matson on Plaintiff's team told him on January 24, 2024, now in hindsight he believes Mr. Pautz was purposely sabotaging Plaintiff's ability to get work done by not providing clarity and therefore setting Plaintiff up for failure. However, when Plaintiff asked Ms. Drobnicki if she was having a challenge like this she said "no things are pretty clear with Mr. Pautz – he lets me know pretty clearly what he's looking for – maybe just try talking with him."

89.     This statement delivered by Ms. Drobnicki provides direct evidence of different treatment by Mr. Pautz in that he always provided clear instructions and responsibilities to Ms. Drobnicki, Plaintiff's younger female peer, but never gave Plaintiff clarity on his duties. This was a subtle but effective way to undermine Plaintiff's position and make Plaintiff's working conditions hostile.

90.     On one project in particular in the March to June 2023 timeframe, the team, Mr. Pautz, Plaintiff, and Mr. Cassidy, were working with partners from other parts of the business – the Licensed User Churn Initiative. On multiple occasions Plaintiff asked Mr. Pautz to help the team

understand who was doing what. Mr. Pautz wouldn't have a straightforward conversation about it. Ultimately Plaintiff put together a single slide enumerating roles and responsibilities across the dozen or so people involved in the project and sent it to Mr. Pautz. Mr. Pautz said it was great and he'd connect with his counterpart in the Service organization and drive alignment.

91.     Despite saying that, Mr. Pautz never followed up and the project remained a mess for many months thereafter. Mr. Pautz was asking Plaintiff to work on this project without any clear direction as to his role. Based on all of the circumstances surrounding this failure to act to move the project forward, it was obvious that Mr. Pautz was setting Plaintiff up for failure.

92.     In comparison, based on Plaintiff's direct observations and his conversations with Ms. Drobnicki, Mr. Pautz always gave her clear goals and responsibilities especially on her major initiative, called "The Re-engage Initiative."

93.     Up to this point in June of 2023, Mr. Pautz was consistently reducing Plaintiff's team size, taking away projects, making age related comments, cutting Plaintiff out of important meetings and giving work Plaintiff had been doing to his younger female colleague. Also, around this time, Plaintiff's team raised complaints around working with Mr. Pautz and seeing how he was treating the Plaintiff. James Derr on Plaintiff's team told the Plaintiff: "Mr. Pautz has it out for you. Something is going on here. I think you need to do something. I'll go to HR if you need me to but this is terrible." Plaintiff asked Mr. Derr to please have some patience as Plaintiff was trying to make things better.

94.     Over this same timeframe March through June of 2023, Plaintiff also led a major effort on a new Seller Experience survey and cross collaboration meetings with senior executives across Gartner to deliver the results of the survey. Early on after joining the team, Mr. Pautz had tried to kill this initiative too, but it was too far along for him to accomplish that. Plaintiff's team

successfully led the effort. Mr. Pautz joined many of the calls that Plaintiff did with all of the senior leaders across Gartner to share the results of the survey, but he didn't have much input into the work.

95.    Members of Plaintiff's team grew accustomed to Mr. Pautz joining calls "To say hi, tell a few jokes, kill the first 10 minutes of every meeting and then pass things over to Rob." At one point, Plaintiff informed Mr. Pautz that he didn't need to join if he was busy because Plaintiff could handle it. Mr. Pautz replied, "No I need to be there. I can vibe and connect with these folks in a way that maybe you can't exactly." When Plaintiff asked what Mr. Pautz meant by "vibe" he said, "Ya' know – just connect." The tone used by Mr. Pautz which Plaintiff observed made it clear that "vibe" meant yet again having the right "energy" in the room – another reference to Plaintiff's age.

96.    Also, during this timeframe, April / May / June of 2023, Mr. Pautz worked on a new vision for the team. Rather than drive innovation to improve sales productivity, the new mission became, "We fix shit for sales." Mr. Pautz and Plaintiff had a couple heart to heart comments about how the team was constructed and what people were hired to do (which wasn't to "fix shit") and Mr. Pautz said if people don't like the new mission, "They know where the door is and so do you – you can get with it or not – I don't really care." Again, being told to get "with it" was under the circumstances of that call, a negative referencing to Plaintiff's age.

97.    Despite the challenges with Mr. Pautz, from January through this timeframe, June / July 2023, in Plaintiff's regular weekly one-on-one meetings with Mr. Pautz Plaintiff would ask for feedback about his performance. Plaintiff was consistently and without hesitation or exception told on every occasion that he was operating at an "E level" and that Plaintiff will  know if that changes because Mr. Pautz will "come find him." Mr. Pautz specifically said he's "Not shy about

those types of things" and has had to deliver messages like that in the past. Plaintiff thanked him for the transparency and each time said it's good to know he was delivering "E" quality work for the team.

98.      Despite confirmation of Plaintiff's "E" level performance, around the May / June 2023 timeframe Mr. Pautz made it clear that he wanted to be on any call that Plaintiff did with senior people across Gartner. Plaintiff complied with that request – inviting him to any such meetings. On occasion he would skip them. But for the most part, Mr. Pautz would join, make a few comments to, "Warm up the call and intro the topic," and then he would turn things over to Plaintiff.

99.      Upon information and belief, the basis of which are Plaintiff's observations and conversations with colleagues, Mr. Pautz imposed no such rule on Ms. Drobnicki (or Deirdre Walsh after she joined the team) that he must be on any and all calls with any senior executives along with them. It was yet another form of disparate treatment based on Plaintiff's sex, as a male, and yet another cause for concern.

100.    Also, during this time period of March through June of 2023, Mr. Pautz's sexual jokes began to be directed not just about female colleagues but directly at the Plaintiff. These "jokes" or sexually charged innuendo and ridicule, would usually be delivered without witnesses on Plaintiff's one on one calls with Mr. Pautz.

101.     On June 15, 2023, the team had gotten alignment with senior leadership on final steps in the Pathway to Gold for sales. On June 20, 2023, at a one on one between Mr. Pautz and Plaintiff, Mr. Pautz was talking about the project and how there was a need to do some writing of detailed descriptions for the steps and he said to Plaintiff, "You're going to have to toss some

word salad on this one, Malkani. You went to law school. I bet you can toss some word salad, right?"

102.    The reference to "tossing the salad" is a well-known slang reference to a specific act of oral sex. Plaintiff was offended because Mr. Pautz was jokingly suggesting that he had skill and experience in performing this sexual act and that he was willing to do so.  Plaintiff was shocked at the offensive remark because "tossing the salad" is a very graphic, slang sexual reference.

103.    In June, the meeting originally scheduled for April 2023 with the CEO was re-scheduled for June 2023. Mr. Pautz and Plaintiff were working on the deck for the meeting. On June 21, during a prep call with Mr. Pautz, Mr. Matson (35 years old), and the Plaintiff, they discussed roles and responsibilities for the meeting – given it was with the CEO they needed to be ready and aligned.

104.    During that preparation call Mr. Pautz said let's talk about who will speak. Plaintiff suggested Mr. Pautz do some of the stuff upfront and then Mr. Matson and Plaintiff can split the speaking parts after that. Mr. Pautz took a moment and then said he didn't think they should have all that back and forth with different speakers. Then Mr. Pautz said, "I think only one of you two should speak." There was an awkward pause. And then he said so, "Rob you can decide but just one of you guys." Plaintiff said, "Okay, well this is a really important piece of work from my team so I'll speak." Mr. Pautz thought about it a moment and then said, "I hear you but no, I want Mr. Matson [who was Plaintiff's subordinate and roughly 18 years younger] to do it instead of you. You can step aside." Plaintiff reminded Mr. Pautz that he had just told them that he, the Plaintiff, could decide who speaks. Mr. Pautz responded, "No, I want Mr. Matson to do it." This was further evidence of the disparate exclusion of the Plaintiff from important work based on age.

105. There was no legitimate reason why Mr. Pautz would have replaced Plaintiff on such an important and highly visible presentation which was in Plaintiff's purview and for which Plaintiff was responsible. Appointing Plaintiff's much younger colleague to present was a further act of age discriminatory behavior, the pattern of which is obvious from the circumstances leading up to this June 2023 decision. Asking Plaintiff to "step-aside" was another obvious age-related jibe. After that call, Mr. Matson said to Plaintiff that it was probably the most uncomfortable call he's ever been on and that he was sorry for what Mr. Pautz did to the Plaintiff.

106. Two days later after undermining Plaintiff's authority in front of his team and giving key work to Plaintiff's subordinate who is roughly 18 years younger than he, Mr. Pautz proceeded to humiliate Plaintiff further over email. During an email exchange on June 23, 2023, after Mr. Pautz had told the Plaintiff that he wouldn't let him present in the meeting, Mr. Pautz replied to an email Plaintiff sent him (that included Mr. Matson from Plaintiff's team on the exchange) with the following comment- "Get with the program gramps [smiley face]."

107. This email captured the prior six months of comments, jokes, and innuendo from Mr. Pautz about Plaintiff's age and stated his ageist view of the Plaintiff quite plainly. This is direct evidence of discriminatory intent on the part of Mr. Pautz.

108. Plaintiff was embarrassed and humiliated, especially with this insult coming on the heels of Mr. Pautz undermining Plaintiff on the call with Mr. Matson and choosing him to present instead of Plaintiff. Plaintiff didn't address it with Mr. Pautz for fear of retaliation. Plaintiff by then had seen enough from Mr. Pautz to know he can lose his temper like he did regarding the pipeline stages and / or he can be untrustworthy like he was with the backfill on Plaintiff's earlier role. Mr. Pautz could also cut Plaintiff out entirely of major projects and totally marginalize him.

And Mr. Pautz had already made many thinly-veiled ageist references to Plaintiff's "energy" and needing to "get with it" – and needing to "step aside" – all references to Plaintiff's age.

109.    Given the actions of Mr. Wartinbee in shutting down even the most careful complaint about Mr. Pautz, Plaintiff worried that reporting Mr. Pautz's obvious illegal discrimination and sexual harassment would further enrage him and Plaintiff might actually find himself out of a job.

110.    Several days after the June 23, 2023, email, on or around June 27, 2023 – on another planning call for the CEO meeting, Plaintiff joined the call before Mr. Matson arrived and Mr. Pautz said, "What's up gramps?" When Plaintiff didn't respond as he was in shocked silence at another egregious and obviously insulting joke at his expense, Mr. Pautz said, "You know I'm kidding." Plaintiff didn't say anything but again was humiliated and went on with the agenda for the call.

111.    Plaintiff determined that the best path forward was to try to just appease Mr. Pautz and not trigger him. Mr. Pautz had cut Plaintiff out of meetings, taken roles from him, killed most of the projects that he was working on at the beginning of the year, told Plaintiff to tell his team that if they don't like the new mission, they know where the door is and so does Plaintiff, insulted Plaintiff publicly and said he needs to join all Plaintiff's calls with senior people. Upon information and belief the basis of which are Plaintiff's observations and conversations with colleagues, Mr. Pautz's behavior was not directed at other members of the team – specifically Ms. Drobnicki or  Ms. Sati under her.  Plaintiff was worried about making things work and assumed if he complained about being treated differently than Mr. Pautz treated other people because of his age and his sex that there would be retaliation.

112.    On July 10, 2023, at another one on one meeting with Mr. Pautz, he asked Plaintiff about the progress on the descriptions of the Pathway to Gold steps and said, "Yo…how's the salad tossing going with James? You two making it happen?" Plaintiff said "Ummm…okay…we're making progress if that's what you mean." Mr. Pautz said "Yeah, yeah, of course." This was yet another joke implying that Plaintiff was engaged in an act of oral sex with James. The "salad-tossing" joke was a frequent source of fun for Mr. Pautz.

113.    Again, the sex joke was unwelcome and inappropriate and delivered when others were not on the call. Again, Plaintiff was disturbed that Mr. Pautz was yet again making another sexual reference and this time involving one of the members of Plaintiff's team, i.e. James. Plaintiff then went on to elaborate the joke, "Hey, with James. Just keep him away from people. You can do whatever you want with him. Just keep away from other humans." In the context of the tone of voice and body language and facial expressions of Mr. Pautz which Plaintiff observed, this was clearly a further sexual jibe at Plaintiff's expense. Plaintiff didn't even know how to respond to Mr. Pautz saying, "You can do whatever you want with him." Mr. Pautz was clearly making a suggestive sexual remark of some sort about James and Plaintiff and it made Plaintiff very uncomfortable.

114.    For the next several months, Plaintiff and his team worked on various projects mostly without a lot of interaction with Mr. Pautz as he focused most of his time and energy on a major initiative with Ms. Drobnicki, his other direct report at the time. During this time and in the immediate aftermath of Mr. Pautz calling Plaintiff "gramps" on two occasions – he spent his time primarily with Ms. Drobnicki and became less involved with Plaintiff and his team.

115.    Around late August or early September, however, Mr. Pautz engaged in humiliating conduct towards Plaintiff in front of the broader team. All of the people on Mr. Pautz's team

(Plaintiff, Mr. Matson, Mr. Cassidy, James Derr, Ms. Drobnicki, and Ms. Sati) were on the call. Plaintiff was by far the oldest person on the call. Mr. Pautz, early 40s, was the next oldest person. Plaintiff was the only person in his 50s on the call. Plaintiff proposed a working model to help prioritize the team's efforts across groups at Gartner and structure the work within Mr. Pautz's team.

116.    Mr. Pautz let Plaintiff finish his suggestion and then in front of the entire group he said "Rob…Rob…We're not doing any damn Steerco" in a very condescending manner. Plaintiff had never heard Mr. Pautz curse at anyone on a group call before – nor did Plaintiff ever hear him curse at anyone but Plaintiff after that time. Everyone was silent for a moment and then Mr. Pautz moved on to ask Ms. Drobnicki (his other direct report, and nearly 20 years younger than Plaintiff) what she thought the team should do. After the call, two members of the team (Mr. Matson and James Derr) reached out to express their dismay at how Mr. Pautz had treated Plaintiff on the call. They had witnessed Mr. Pautz's condescending, hostile tone and language towards Plaintiff specifically on other occasions but now there was cursing in a group setting.

117.    On another call in roughly mid-September 2023, the team were again discussing how to organize work across the entire team. Participants on the call were Mr. Pautz, Plaintiff, Mr. Cassidy, Mr. Derr, Mr. Matson, Ms. Drobnicki, Ms. Sati, and now Deirdre Walsh who is the woman who joined the team officially a bit later in 2023 and took over many of Plaintiff's responsibilities after his role was allegedly "eliminated." At one point the team were discussing who does what in terms of who should take the lead to approach our technology partners and Plaintiff asked Mr. Pautz if he had a view and could he give a little direction. Mr. Pautz paused for a moment, inhaled deeply, looked frustrated, then said "Really? Really? I don't have time for that grammar school bullshit!" directed at Plaintiff in response to his question.

118.    Plaintiff felt humiliated at what he interpreted as a clear age-related remark. Mr. Pautz

was making reference to his age and his perception of Plaintiff's ability to comprehend, process,

and think appropriately. Plaintiff was, according to Mr. Pautz, too old to even think like a normal

adult. In all the group calls Plaintiff had been on with Mr. Pautz, including with his directs

throughout the year – and from that point forward when his directs were Plaintiff, Ms. Drobnicki

and Deirdre, Plaintiff had never heard him speak to anyone else that way.

119.    Upon information and belief, the basis of which is Plaintiff's conversations with

colleagues, no one on Plaintiff's team ever heard Mr. Pautz speak to anyone that way other than

the Plaintiff.

120.    After that call, once again, members of Plaintiff's team, specifically Mr. Matson and Mr.

Derr, encouraged Plaintiff to go to HR because they felt Mr. Pautz was being abusive towards

Plaintiff (not only his tone but cursing at Plaintiff in front of other people) and had been

increasingly so in the prior weeks. They said that they observed that Mr. Pautz treated Plaintiff

differently than his younger or female colleagues.

121.    Notwithstanding his colleagues' insistence, Plaintiff declined to report the unlawful

discrimination and sexually hostile environment created by Mr. Pautz to HR at that time.

Plaintiff knew from his last conversation with Mr. Wartinbee, that at the executive level at

Gartner, any report about a superior would result in the termination of the complaining

executive, and possibly of their team. Plaintiff told the team that they were of course free to

report Mr. Pautz's discriminatory behavior if they wanted to do so.

122.    On September 18, 2023, at another one on one meeting with Plaintiff, Mr. Pautz was

talking about Deirdre coming to join the team and report to him and he said "Deirdre is one of

the loveliest humans you'll ever meet in your life…not that I'd get lovely all over that…still,

she's great." Plaintiff was shocked that Mr. Pautz was describing a new team member and future peer in terms of whether or not he would "…get lovely all over that." The clear meaning of this comment was that Mr. Pautz meant to express that he didn't find Deirdre sexually attractive. Plaintiff had no idea why that was relevant to the conversation and it was upsetting to Plaintiff.

123.    Mr. Pautz's inappropriate sexual comments to Plaintiff in meetings were discriminatory based on sex in that Mr. Pautz did not subject Plaintiff's younger or female peers to such disgusting and offensive suggestions and opinions. The highly sexual nature of the comments were observable to Plaintiff in Mr. Pautz's tone of voice and body language as well as his facial expressions, which Plaintiff observed during these conversations.

124.    On September 29, 2023, Mr. Pautz forwarded Plaintiff an email chain that included him, Kate Elsam and Lauren Ritchie. In the email chain he mentions to Ms. Elsam and Ms. Ritchie that he'll get Plaintiff to do some specific work. Mr. Pautz then forwarded the email chain to Plaintiff with two words "Grab it" – and no punctuation. Several days later on October 2, 2023, Plaintiff asked Mr. Pautz about the project and Plaintiff said, "I saw you said 'grab it' about the Pathway to Gold work and I'm on it."  Mr. Pautz jumped in and said "Yeah, we now know you toss the salad with the best of them…you seem good like that so have at it okay?" Again, Plaintiff was offended that he yet again talked about his work in terms of a very graphic sexual activity of "tossing the salad."

125.    During that September timeframe and after, Mr. Pautz's tone on most calls remained dismissive and condescending towards Plaintiff alone, often in front of other people. This was a frequent or even constant occurrence that was humiliating to put up with. It got so bad that Plaintiff worried his only recourse was to leave the team – so Plaintiff applied for a different job inside Gartner around the beginning of October of 2023.

126.    Gartner encourages moving within the Company and employees need to inform their bosses if they are pursuing other jobs. Employees have to tell their boss if they pursue something. Plaintiff told Mr. Pautz that he was applying for another job at Gartner. Plaintiff said he thought it was a great fit given his background on the product team before he came to GSSO. The truth was Plaintiff was just trying to get away from Mr. Pautz any way possible. Mr. Pautz claimed he was supportive of Plaintiff's effort and offered to speak with the hiring manager. Plaintiff declined that offer which seemed to offend Mr. Pautz.

127.    Plaintiff made it to the third and final hiring round for that job and it came down to three people but Plaintiff did not get the position because he was told another internal applicant was a better fit. In keeping with the management preference for younger executives, the other candidate chosen was a young male approximately 40 years of age. Plaintiff believes that he was equally or more highly qualified and experienced than the other candidate.

128.    Also, around this time in September, Mr. Pautz informed the team that he had made the official decision to hire one of his old direct reports to join the team – so as a peer to Ms. Drobnicki and Plaintiff reporting to Mr. Pautz. Mr. Pautz's direct reports would now consist of Plaintiff, Ms. Drobnicki and Deirdre Walsh. It was an odd time to bring someone on as the team didn't seem to have enough work as it was and Mr. Pautz hadn't mentioned any new initiatives. It was unclear what Ms. Walsh would do. The answer was: Plaintiff's job.

129.    Ms. Walsh joined the team as Plaintiff's colleague in roughly mid-to late October of 2023 on a full time basis though her arrival was announced on September 20, 2023 and for some time in September she had been joining meetings here and there to see what the team was working on.

130.    During one of the Plaintiff's one on ones with Mr. Pautz after the announcement of Ms. Walsh's arrival, Mr. Pautz told the Plaintiff that he "loved Deirdre" and that she'd be "great."

Mr. Pautz also said that when he left his prior team (where he was Ms. Walsh's boss) he advocated for her to be elevated into the role he was vacating. However, Mr. Pautz's former boss, Dharmesh Shah, Group Vice President, Sales Operations, said "Deirdre's not qualified to be a VP or lead a team." Despite that Mr. Pautz was eager to "get her over to [his] team" and also "to take care of her and get her promoted to VP." Which is what happened when Ms. Walsh joined the team officially in October of 2023.

131.    Ms. Walsh got a promotion to VP and now leads a team – having had one of Plaintiff's direct reports get moved over to report to her with his departure from the team. Ms. Walsh had spent roughly ten years in the role of "Director" at Gartner before Mr. Pautz brought her over to his team, got her promoted, gave her Plaintiff's work and then eliminated Plaintiff's role under circumstances which Plaintiff observed, that demonstrated obvious illegal discrimination and targeting behavior towards Plaintiff by Mr. Pautz.

132.    Shortly into Ms. Walsh's tenure on the team, roughly the second week of October 2023 or so, Plaintiff and Ms. Walsh spoke and she confided in Plaintiff that she didn't have enough to do on the team and was worried about having impact on the team.

133.    Mr. Pautz shortly thereafter began giving Deirdre work that Plaintiff's team had been doing – and even work that Plaintiff had been doing himself directly. In particular, Deirdre took over a major effort Plaintiff had been working on with Mr. Pautz called "Pathway to Gold." On October 9, 2023, Deirdre emailed Plaintiff and said "Eric [Mr. Pautz] asked that I take on the project of partnering with Sales comms on updating this PTG page…My 1st step is to acquire from Jen Wolter signoff on the descriptions. Can you please email me the most current ppt version of the descriptions that you have?" Mr. Pautz didn't say anything to Plaintiff directly –

never mentioned anything, not one word – suddenly Ms. Walsh just came to Plaintiff to take over his work. The first Plaintiff heard of it was from Ms. Walsh – the newest member of the team.

134.    "Pathway to Gold" is a set of best practices for Gartner's sellers and sales leaders. The project involved creating the steps, fleshing out descriptions and then updating lots of materials on the internal website to align with the Pathway and also working with other stakeholders to implement the pathway into sales training, sales technology, etc. It was a major high profile effort that had the attention of the CEO and Ms. Walsh took it over from Plaintiff without so much as a courtesy email from Mr. Pautz.

135.    This bizarre and unusual conduct, of failing to communicate with a Managing Vice President prior to stripping him of key job duties is an extraordinarily abusive and disrespectful practice to which Plaintiff's younger and/or female peers were never subjected.

136.    Often Plaintiff's team would find out from Ms. Walsh that she was now leading something and she would come to contribute to the effort without the team hearing anything from Mr. Pautz directly. It was as if Mr. Pautz no longer wanted to interact with Plaintiff but wanted to have the two female members on his team be his only two de facto direct reports.

137.    Also, around October of 2023, Mr. Pautz did something else unexpected by putting Ms. Drobnicki (the third of his direct reports who is roughly in her mid-30s) in charge of deciding whom should do what across almost the entire team and said to Plaintiff: "You should go to her for work." Mr. Pautz essentially demoted Plaintiff by having Plaintiff report to a junior VP on the team who reported to him.

138.    Plaintiff was shocked and dismayed that Mr. Pautz would deliberately undermine Plaintiff and his authority by having him report to Ms. Drobnicki in substance if not officially – and what's more he wanted each of the members of Plaintiff's team to also go individually to

Ms. Drobnicki and not through Plaintiff to her. This unnecessarily offensive action further undermined and marginalized Plaintiff's role leading his own team. Plaintiff was stripped of all managerial responsibility in favor of a younger woman on the team. Pairing this development with Ms. Walsh now taking over Plaintiff's projects and telling him directly versus Mr. Pautz saying anything at all about it to Plaintiff was humiliating and outrageous.

139.    Upon information and belief, the basis of which is Plaintiff's observations and conversations with colleagues, none of this type of egregiously humiliating behavior was directed at Ms. Drobnicki, Ms. Sati, or Ms. Walsh, by Mr. Pautz.

140.    When Plaintiff raised, after two weeks, concerns that Ms. Drobnicki hadn't structured any work for Plaintiff's team, Mr. Pautz said "Well I'd be worried if I were you – if Mr. Wartinbee didn't give me work, that would be a problem." Plaintiff said it's a challenge with Ms. Drobnicki and she seems to need help with this conceptually – she's jumping in and doing things but not organizing the overarching effort and delegating, he said "You better just figure out what to do – do something – or you're in trouble." Plaintiff was very concerned after that call.

141.    Normally, a primary function of a manager is to determine an objective or course of action and delegate across their team to accomplish those objectives or actions.  Mr. Pautz had arbitrarily abdicated his responsibilities to Plaintiff as a member of his team. And worse, Mr. Pautz now had demoted Plaintiff and had Plaintiff reporting to Ms. Drobnicki. It was confusing and disheartening for the Plaintiff.

142.    Plaintiff once again discussed this untenable situation with Mr. Pautz with his team and they all expressed frustration and shock that Mr. Pautz had singled Plaintiff out for this bizarre behavior and had effectively demoted him. The team once again urged the Plaintiff to report the misconduct to HR or Mr. Wartinbee (Mr. Pautz's boss) but Plaintiff said he still wanted to try

some more to make it work with Mr. Pautz. Plaintiff knew that he could not go to Mr. Wartinbee after he broke off all contact with Plaintiff in retaliation for raising a concern about Mr. Pautz's behavior early in 2023.

143.    Around this time Plaintiff needed to manage out Mr. Cassidy from his team for performance reasons. Plaintiff met with Mr. Pautz in person on September 28, 2023 in Stamford, Connecticut. Mr. Pautz is 6'4 and roughly 250 pounds and when he came into the room, Plaintiff put out his hand to shake. Given all the acrimony of late Plaintiff felt that was the most appropriate greeting. Instead, Mr. Pautz reached out and said, "Nah, come here!" and pulled Plaintiff in and gave him a bear hug that lasted a moment too long and was a bit too forceful.

144.    This bizarre and inappropriate greeting invaded Plaintiff's personal space in an overly intimate way that felt sexually suggestive in the context of Mr. Pautz's body language which Plaintiff observed and felt during this long and awkward embrace. Plaintiff felt humiliated to be handled and touched in such a familiar manner by a superior. It was as if Mr. Pautz was sending a message to Plaintiff about who is in charge not only professionally, but physically. Plaintiff felt that the inappropriate embrace was an intentional form of intimidation. And it worked. The Plaintiff spent the next thirty minutes in a windowless room with just Mr. Pautz wondering if he should be concerned about his physical safety.

145.    During that in person meeting on September 28, Mr. Pautz said definitively that Plaintiff would be able to hire a new person for the role vacated by Mr. Cassidy. Plaintiff confirmed and said, "We had this problem once before so just man to man, can I backfill the role? You can tell me." Mr. Pautz assured Plaintiff yes, that he could fill the role. Once again, once Mr. Cassidy was officially out Mr. Pautz said that Plaintiff couldn't backfill the role. Sadly, Plaintiff wasn't surprised that Mr. Pautz had lied to him once again.

146.    Mr. Pautz had now singled Plaintiff out for disparate treatment yet again. First by taking Plaintiff's open role for himself, then not allowing Plaintiff to backfill a role, then by sending a member of Plaintiff's team to work for Ms. Drobnicki (a younger woman on the team), then not allowing Plaintiff to backfill a second role after saying yes, and then ultimately by eliminating Plaintiff's role and moving a member of Plaintiff's team under Ms. Walsh, a woman on the team.

147.    In early October 2023, Mr. Pautz said Plaintiff should make himself and his team available if Ms. Drobnicki or Ms. Walsh need, "Anything at all because they just have a certain [he paused]…ability to get things done." Plaintiff accommodated that request and told his team to do whatever Ms. Drobnicki (or even Ms. Sati on her team) or Ms. Walsh ask of them. I said, "Sadly if they ask you to pick up their drycleaning I think we have to do it."

148.    From then on, James Derr on Plaintiff's team regularly did work directly for Ms. Sati who reported to Ms. Drobnicki, in addition to his responsibilities on Plaintiff's team. Mr. Derr would regularly say he felt like he was Ms. Sati's executive assistant.

149.    This treatment of the Plaintiff was in sharp contrast to how Mr. Pautz treated the women on the team. At no point did either of them ever offer to help Plaintiff's team with work. It was not a mutually collaborative effort. Mr. Pautz simply stated that Plaintiff should go to the women on the team and stop coming to him for anything.

150.    Shortly after that Plaintiff had a call with Ms. Walsh, in mid-October 2023 to get her take on where things are with Mr. Pautz and she said "I think you now basically report to Ms. Drobnicki. So keep her happy."

151.    Despite Plaintiff's team urging him to report Mr. Pautz to HR for how he had been treating Plaintiff and how the team was being run, which they all said was the most dysfunctional, outright hostile and abusive experience they had ever witnessed in their lives,

Plaintiff continued to stay silent until October of 2023 when he finally told the team he would go to HR as they had been suggesting for months.

152.    On October 18, 2023, Plaintiff spoke with Senior HR professional Lauren Ritchie, who is the Group Vice President, HR, and who is approximately 39 years old. Plaintiff made a specific complaint about Mr. Pautz. Ms. Ritchie immediately shut down the complaint as Plaintiff was trying to deliver it and dismissed Plaintiff as Mr. Wartinbee had done months before.

153.    In spite of Plaintiff raising the issues he was having with Mr. Pautz, rather than allow Plaintiff to further report the details, Ms. Ritchie interrupted, shutting Plaintiff down and said that she knew Plaintiff was in the process of trying to get a role on a different team and she said that it "…might be good if that happens." Ms. Ritchie said that she's: "Not sure anything is going to change with Mr. Pautz anytime soon." Plaintiff was disheartened to say the least. Plaintiff was trying to report discrimination and the answer he got from HR was basically that it wasn't going to change.

154.    In early November 2023, Mr. Pautz's then boss, Mr. Wartinbee, who runs the entire Global Sales Strategy and Operations business unit reached out to Plaintiff to ask for feedback on Mr. Pautz as part of the annual review cycle. Plaintiff was torn about how to handle the situation – and whether he should be transparent and risk retaliation and / or ruining his relationship with Mr. Pautz. Plaintiff was terrified because of Mr. Wartinbee's previous harsh and retaliatory action of refusing to meet with Plaintiff after he raised some initial concerns about Mr. Paultz.

155.    Plaintiff decided to try to thread the needle by providing some positive feedback along with roughly five pages of very detailed areas for improvement with many examples of how working for Mr. Pautz had become increasingly challenging, including quotations from calls,

during which Mr. Pautz cursed at Plaintiff in front of other people. Plaintiff sent the feedback to Mr. Wartinbee on November 8, 2023 and he replied the same day – "Thanks, Rob.  This is very helpful feedback and I appreciate you taking the time to properly capture it.  Sorry to hear about your experiences this year, but that's what feedback is all about – helping him get better and driving greater impact.  I'll start coaching these areas immediately…  and please keep me posted on how things are going."

156.    It later became clear that Mr. Wartinbee must have informed Mr. Pautz about the negative feedback because Mr. Pautz became increasingly hostile and abusive at this time immediately after Plaintiff submitted the negative feedback. Mr. Matson on Plaintiff's team noted that he saw a meaningful change in Mr. Pautz's negative behavior towards Plaintiff at that time as well.

157.    On or about November 14, 2023, Mr. Pautz informed Plaintiff that the team was moving under Ms. Elsam, so that Mr. Pautz would no longer be reporting directly to Mr. Wartinbee. A few days later at another one on one on November 20, 2023, Plaintiff asked Mr. Pautz how he felt about the move and he said "I guess there could be worse things than being under Kate!" And Mr. Pautz comedically raised an eyebrow. Plaintiff didn't know what to say to such a sexually inappropriate comment, so all he said was, "Oh. I don't really know her that well." Mr. Pautz responded with, "She's wonnnddddeerrrfulll!" with the word very drawn out and he smiled and tilted his head. Plaintiff observed based on Mr. Pautz's facial expressions, tone, inflection, and body language that this was yet another sex comment about a female colleague's attractiveness. This was consistent with Mr. Pautz's prior comments about, "Getting wonderful all over that," his frequent remarks about women in the past, including Ms. Elsam.

158.    It was obvious from the body language, tone of voice, and suggestive looks which Mr. Pautz gave Plaintiff and which he observed directly during this conversation, that Mr. Pautz found Ms. Elsam attractive and that he was reconfirming that he found her attractive and would have no problem being "under her" sexually. Plaintiff was disturbed that Mr. Pautz was yet again commenting about women in terms of whether he would want to be involved with them sexually. Given Mr. Pautz's previous remarks about Plaintiff "tossing the salad," and doing "whatever he wants" with Mr. Derr, Mr. Pautz was making it very uncomfortable to interact with him. It was not long after this that Plaintiff's relationship with Mr. Pautz hit a low point when Mr. Pautz cursed at him in his most vitriolic and angry way yet.

159.    On or about November 15, 2023, Plaintiff was walking with a colleague from the marketing group that had recently been moved over to GSSO under Mr. Wartinbee. The colleague, Marci Augustine, asked Plaintiff how things were going and he said "Eh, not great." At this point, Ms. Augustine told the Plaintiff that she knew that Mr. Pautz probably would not like working with a "more experienced" manager. Ms. Augustine was obviously referring to Mr. Pautz's dislike of older executives.  Plaintiff admitted that was the problem – and said Mr. Pautz doesn't seem to work well with someone "like me" with "experience". She said, "Well, I see it and it seems pretty obvious."

160.    On December 4, 2023, during a weekly one on one call between Mr. Pautz and Plaintiff. During the call the team began discussing their efforts around "Gen AI" for sales. Mr. Pautz was not a huge fan of this effort generally but allowed the Plaintiff's team to keep pushing ahead because he knew it was an important Gartner-wide effort.

161.    At their one on one meeting on December 4, 2023, Plaintiff  recapped where his team was on the "Gen AI" efforts, and Mr. Pautz became very hostile to the Plaintiff, at one point

angrily saying "You don't know what the fuck you're doing" to which Plaintiff responded "I honestly don't know what you mean." Plaintiff and Mr. Pautz had a very tense discussion about the work and what the Plaintiff had done and what he was planning to do. Plaintiff said that he had done what Mr. Pautz had asked and what the team had agreed to do. Mr. Pautz said, "I honestly don't know what's going on with you here." Plaintiff responded that he did not want to "risk" further frustrating Mr. Pautz so he suggested he stop the "Gen AI" project. Mr. Pautz said "Risk??? Risk??? You already are frustrating me man!" Plaintiff said he was only doing the things they had literally aligned on which Mr. Matson on Plaintiff's team who was leading day to day will attest to as will numerous emails on the subject and Mr. Pautz said, "Listen, maybe you need to pick up a fucking pen next time and write down the words coming out of my mouth so you can get it right. Cause I don't know if there's something going on with you or what."

162.    It was obvious from the body language, tone of voice, and facial expressions which Mr. Pautz gave Plaintiff and which he observed directly during this conversation, that Mr. Pautz was making a further jibe based on Plaintiff's age, (his continual theme) suggesting that Plaintiff was suffering cognitive dysfunction due to his advanced age. Mr. Pautz had recently labeled Plaintiff as, "Gramps" so under the circumstances, the statement held a particular intended meaning which could not be mistaken by an observer.

163.    Upon information and belief, the basis of which are Plaintiff's observations and conversations with colleagues, Mr. Pautz has never spoken to any younger or female members of his team like that before. The behavior was specifically reserved for Plaintiff and Plaintiff alone.

164.    Immediately after the December 4, 2023 call with Mr. Pautz, Plaintiff discussed the matter with Mr. Matson on his team and at his urging Plaintiff finally decided he needed to further escalate his complaints to HR. Plaintiff spoke with the Senior HR member (Group Vice

President), Lauren Ritchie, for the second time regarding Mr. Pautz, on December 19, 2023, and reported that Mr. Pautz's behavior had become intolerable and that his hostile and abusive behavior and misconduct based on age and sex had to stop. Ms. Ritchie immediately shut down Plaintiff's complaints once again, telling Plaintiff that, "I think you need to just figure out what he wants and try to give it to him." Plaintiff replied, "That's it? Just give him what he wants?" Ms. Ritchie said, "I think that's best." Ms. Ritchie was not interested in addressing Plaintiff's concerns at all or investigating the complaints of harassment and discrimination.

165.    Because both Mr. Wartinbee and now Ms. Ritchie (twice) had shut down and refused to address the outrageous behavior of Mr. Pautz reported by Plaintiff, the Plaintiff stopped complaining for fear of further retaliation. Exactly three weeks later to the day after the third report of discrimination and harassment by Plaintiff to Gartner on December 19, 2023, Plaintiff's position was "eliminated."

166.    The Plaintiff decided to elevate the matter to Kate Elsam when the company returned from the holiday vacation in late December 2023. Plaintiff set up a meeting with Kate Elsam for the first full week when everyone was back from vacation on Tuesday, January 9, 2024. Plaintiff's intent at that meeting was to report all of the conduct of Mr. Pautz even if they tried to shut him down as Ms. Ritchie and Mr. Wartinbee had done previously.

167.    On the morning of Plaintiff's meeting with Ms. Elsam to further report on Mr. Pautz's misconduct on January 9, 2023 at 9:28am EST, two minutes before the meeting start time, Plaintiff saw that his meeting with Ms. Elsam was forwarded to a member of HR, Jamie Marshall, the primary HR business partner to the GSSO business unit. Plaintiff was obviously concerned. The meeting started at exactly at 930am EST and Ms. Elsam immediately said: "Rob

this is going to be a difficult conversation." Plaintiff knew instantly what was coming and went into a state of shocked silence.

168.    Over the next few minutes, Plaintiff was informed that after a "strategic review" of all the work the team needed to do going forward, Plaintiff's role was being eliminated because they don't need someone "at his level" given the work they want the team to do. They said one of my two direct reports (James Derr) would now report to Ms. Walsh (the woman Mr. Pautz had brought over only a couple months before, the one who had worked for him in his other role before he became Plaintiff's boss, the woman he had gotten promoted to Vice President in connection with the move) and Plaintiff's other direct report (Mr. Matson) would go to a different team not under Mr. Pautz. The work Mr. Matson had been doing would now be handled by Ms. Drobnicki (Mr. Pautz's other direct report) and Ms. Sati who reports to her. So all of Plaintiff's duties and responsibilities were being given to Ms. Walsh and Ms. Drobnicki.

169.    Gartner presented an offer of severance to Plaintiff and said his official termination date would be February 12, 2024 so that his annual stock vesting could occur. However, Gartner told Plaintiff he would get no bonus for calendar year 2023 even though he was being terminated in 2024. In fact, Gartner timed the termination so that Plaintiff was just days away from bonuses being paid.

170.    First, Plaintiff said he was in shock so he was not thinking clearly. But then Plaintiff asked: "Am I really getting no bonus for completed 2023 work? I've been at Gartner for nearly 6 years with 4 straight years of 'E' performance and all this year Mr. Pautz had been telling me I'm an 'E' and I get nothing?" Ms. Elsam and Ms. Marshal said "that's correct."

171.    Gartner asserted that it was a generous offer not to terminate Plaintiff immediately with nothing (not even any severance), but instead have some stock vest and get six months severance

was more than most get, so they said. Plaintiff then said, "Why does Deirdre who came over a couple months ago get to keep her job while I'm out? That doesn't seem fair." They said that they just don't need a managing vice president any longer on the team.

172.    At no time did Gartner offer Plaintiff the chance to take Ms. Walsh's role or take a pay cut to stay on the team. The Defendant did say Plaintiff was free to look for other roles inside Gartner but that come January 30, 2024 Plaintiff needed to sign the separation agreement and come February 12, 2024, he would officially be terminated if Plaintiff didn't find another role within Gartner.

173.    Jamie Marshall (the HR representative) did say that if Plaintiff did find another internal role then he would be paid his bonus out of Mr. Wartinbee's budget. Mr. Marshal also confirmed subsequently that the amount of Plaintiff's bonus is assumed to have been paid to him for financial planning purposes.

174.    Gartner violated its own management policies in terminating the Plaintiff without giving him an opportunity to have a reasonable time to look for another position within the company as younger members of the team were allowed under Mr. Pautz. Merely one month to find a new role is not nearly enough time and Defendants knew that.

175.    Plaintiff had no sense that his job might be in jeopardy at all. Rather, as far as Plaintiff knew he was doing "E" level work because that's what his boss had told him all year and he had no reason to think he was on the verge of having his role "eliminated." Plaintiff thought he was hosting a get to know you call with his boss' boss Ms. Elsam to further report Mr. Pautz's unlawful behavior and instead he got fired.

176.    Subsequent to that call, on January 11, 2024, Plaintiff had learned from a former peer of Ms. Walsh from her old team that the team is actually hiring for multiple roles, including roles at

her current level (VP) and below. It would stand to reason that she could easily go back to the job she had been doing and Plaintiff could continue in the role he had been in for nearly two and a half years before Ms. Walsh came over and took over Plaintiff's duties at the direction of the age and gender biased Mr. Pautz.

177.    Plaintiff spoke with Mr. Matson on January 17, 2024, at 1032am. Mr. Matson said "You should know I got so uncomfortable getting on calls with you and Mr. Pautz. He was so hostile and abusive and treated you so differently from everyone else that I didn't want to be there." Then Mr. Matson said "I've been thinking about sending an email to HR – to Lauren Ritchie – to say I need help understanding the decision to fire Rob. Because I personally saw him be hostile towards him and treat him differently from other people. So please help me understand how this is the outcome." Plaintiff said to Mr. Matson he should do whatever he feels is the right thing to do. Mr. Matson said "I feel it's my duty as a good Gartner citizen to make this known."

178.    On January 19, 2024, at 215pm Mr. Matson called Plaintiff to say he had spoken with Lauren in HR – and then he followed up with an email to her documenting the call – he said he told her Mr. Pautz was hostile towards the men on the team and particularly abusive towards Plaintiff – he said he felt that Mr. Pautz treated the men differently from the women on the team but in particular that was true of Plaintiff – in fact it got so bad he felt uncomfortable being on calls with Plaintiff and Mr. Pautz because of Mr. Pautz's behavior towards Plaintiff. Mr. Matson said he was worried about working with Mr. Pautz going forward.

179.    Mr. Matson also stated that Mr. Pautz had an issue with Plaintiff's age even calling him "gramps" in front of Mr. Matson. Mr. Matson said Ms. Ritchie took copious notes and said she'd look into everything. Unrelated to the call with Ms. Ritchie, Mr. Matson said that all the seller experience work he was doing will now definitely stay with Ms. Drobnicki. So all the work

Plaintiff's team was doing would now remain under Mr. Pautz either having gone to Ms. Walsh or Ms. Drobnicki.

180.    On February 2, 2024, Plaintiff had his annual review for year end 2023 with Mr. Pautz. This was the first contact Plaintiff had with Mr. Pautz since learning of his termination other than emails asking for his team's reviews and requesting that Plaintiff transition work to Ms. Drobnicki. Jamie Marshall, from HR, the same person who was on the call when Plaintiff was informed of his termination, was also on the call.

181.    In yet one final act of abuse, Mr. Pautz took another swipe at Plaintiff's age at this meeting. In the very beginning of the call (again, with Jamie from HR on the call), Mr. Pautz asked Plaintiff to get some documents (files) together to give to Ms. Drobnicki in connection with transitioning Plaintiff's work to her. Mr. Pautz asked that Plaintiff put them in a shared drive and give her access. And then Mr. Pautz said, "If you need help getting it into the digital realm, I can help." This was an obvious reference to Mr. Pautz's perceived view that Plaintiff can't handle or understand modern technology tools. This took Plaintiff all the way back to his first call with Mr. Pautz over a year earlier when Mr. Pautz said "I can probably help you handle things in this new virtual world we're in."

182.    Over the course of the year Mr. Pautz went from having two white male direct reports and 8 out of 10 people on his team being men to two direct reports both of whom are now women younger than Mr. Pautz's male direct reports had been and only one male remained on Mr. Pautz's entire team.

183.    Plaintiff's time enduring the discriminatory treatment of Mr. Pautz took its toll in stress and affected Plaintiff's emotional health. During the time he worked for Mr. Pautz the Plaintiff

has experienced weight loss, and trouble sleeping. Mr. Pautz's harassment and abuse has taken a serious toll on Plaintiff's health – both mental and physical.

184.    Plaintiff was left without anyone to report Mr. Pautz's misconduct to since the Senior HR manager and Mr. Wartinbee himself, had shut down Plaintiff's early complaints about Mr. Pautz. Plaintiff was embarrassed and humiliated and worried that he would get fired if he told anyone else about Mr. Pautz's behavior. Once the Plaintiff reached out for help from HR, that's exactly what happened. Gartner's own research supports the fact the most people don't report harassment for this very reason.

185.    Subsequent to and overlapping with the most recent events outlined above, and following the January 9, 2024, conversation when Plaintiff was informed his role had been eliminated, Plaintiff began to have conversations with other teams across Gartner to explore the possibility of remaining with Gartner. In fact, on January 17, 2024, Mr. Wartinbee made two calls on Plaintiff's behalf to peers of his to see if there was any position that Plaintiff might be a fit for and to recommend Plaintiff for consideration.

186.    One of Mr. Wartinbee's calls was to Yvonne Genovese, Executive Vice President, Global Product Management, the woman who heads the group Plaintiff worked for before moving over to work under Mr. Wartinbee in 2021. The next day when Mr. Wartinbee told Plaintiff he had spoken with Ms. Genovese, Plaintiff  reached out to her and told her what had happened. Ms. Genovese said, "Wow. I am so sorry this happened. It makes no sense. And it ain't got nothin' to do with you. Trust me. You're great and we'd love to have you back here."

187.    Ms. Genovese went on to explain that she likely would have a role opening on her team very shortly under Ernie Bourassa, Senior Vice President, Global Product Management. When she described the role, Product Manager, Plaintiff mentioned that he had only briefly held that

position before so it would be somewhat new to him. She replied "I know you. I'm not worried about that. You'll be great."

188.    The next day on January 18, 2024, Plaintiff spoke with Mr. Bourassa and he said he anticipated having a role open up very soon and he thought Plaintiff would be a great fit for it. Mr. Bourassa mentioned he needed "a couple dominoes to fall" but he expected there would be a role for the Plaintiff very shortly.

189.    Over the ensuing weeks, Mr. Bourassa got the role approved and on or about February 8, 2024. Mr. Bourassa informed the Plaintiff that the role had been posted internally and that Plaintiff should apply. Mr. Bourassa also said, "You'll see the title is VP, don't worry about that. I expect you'll retain your title and compensation as is." Relying on this representation that he would retain his Managing Vice President title and compensation, Plaintiff applied for the role immediately.

190.    Over the next few days, Plaintiff interviewed with HR (Natalie Griffin) and then with Mr. Bourassa, for the position. On approximately, February 14, 2024, Plaintiff was offered the position. However, the title was a demotion to Vice President from Plaintiff's title at the time, Managing Vice President, and the total compensation was 5% lower than Plaintiff's then current pay. Plaintiff attempted to negotiate for his current title and compensation to no avail and accepted the position of Vice President Product Management over email with Mr. Bourassa and HR on February 16, 2024.

191.    During Plaintiff's call with Mr. Bourassa when he attempted to negotiate his offer, Plaintiff specifically asked for termination protection in the form of enhanced severance. Plaintiff informed Mr. Bourassa that he was worried that, "I get onto your team and something

happens, like Eric [Mr. Pautz] does something to torpedo my job or Gartner decides 'oh they don't need me after all' or something happens and I get fired right after joining the team."

192.    Mr. Bourassa responded with a specific promise that the position he was being offered was not subject to withdrawal without just cause. Mr. Bourassa made the promise of just cause employment to the Plaintiff when he specifically said: "Oh Rob you don't need to worry about anything. I'm in this for the long haul. That won't happen. If anything, I'll be expanding your role. Just trust me."

193.    Plaintiff further processed his offer letter through Gartner's HR system ("Workday") on February 18, 2024.

194.    On February 19, 2024, Plaintiff's new position under Mr. Bourassa was fully reflected in Gartner's systems, including in the Gartner's internal organizational charts. As a result, Plaintiff's official first day under Mr. Bourassa in his new VP position was February 19, 2024.

195.    Plaintiff was out on previously scheduled vacation the week of February 19 as was Mr. Bourassa. Despite that Plaintiff emailed with the person whom he was replacing and he provided Plaintiff with materials to review to get up to speed as soon as Plaintiff was back "in the office" on Monday, February 26. Plaintiff kept Mr. Bourassa abreast of his contact with the person whom he was replacing and Mr. Bourassa was pleased to hear of the progress, replying "That's great!" over email while both Mr. Bourassa and Plaintiff were out on vacation.

196.    On Monday February 26 and Tuesday February 27, 2024, Plaintiff worked hard to get up to speed on the new role by reviewing a number of background materials. Mr. Bourassa had mentioned in a text message that he was slammed in back to back meetings having been out the week prior and Plaintiff assumed that meant they would catch up on Wednesday, February 28.

197.    On Wednesday, February 28, beginning at approximately 7am, I began texting with Mr. Bourassa about upcoming work in the new role. At approximately 8am, Mr. Bourassa sent a calendar invite for a one on one meeting with him at 9am, so one hour later. Plaintiff joined that call at 9am assuming they would be talking about priorities in the new job. To Plaintiff's astonishment, Mr. Bourassa's HR Partner, Jennifer Robinson, was on the call. Mr. Bourassa said, "Rob, I have some bad news. Some new information has come to light about your ability to collaborate with our Team NCVI partners. And in light of that we aren't able to move forward with you joining the product team as that's an important part of this role. This unfortunately was not information we had because we moved so quickly but it came to light just recently. I'm so sorry. You've always done great work for me but with this new information we can't go forward. That's all I know so I'll turn it over to Jennifer."

198.    Ms. Robinson then said "We will make your last day March 1, 2024. But you'll be out of the systems today shortly."  Plaintiff interrupted and said "One quick important thing. Will I get my bonus?" Ms. Robinson said yes and that's why they are making March 1, 2024 the termination date. She Ms. Robinson continued on to say "I'll email you a severance agreement to your personal email address. It will offer severance at the old MVP level which is 6 months. Plus there's a COBRA subsidy in there. If you have any questions, you can reach out to me." Plaintiff said "I have whiplash and don't even know what to say."

199.    Plaintiff asked specifically where the mysterious "new information" that was the cause of his sudden termination came from. Mr. Bourassa and Ms. Robinson said that they could not say. Plaintiff asked then what the new information was and once again they said they could not say. Later on February 28, 2024, Plaintiff received a severance agreement at his personal email and at approximately 11:30am his access to Gartner systems was terminated.

200.    Plaintiff had been a little concerned that Mr. Bourassa did not send out an announcement about Plaintiff rejoining his team on February 26, 2024, the first day both were back from vacation. Plaintiff assumed Mr. Bourassa was just very busy after being out of the office. That said, Plaintiff took it upon himself to reach out to the two most critical Team NCVI partners he would be working with in his new role, Michael Chalk, Group Vice President, Gartner Business Services, and Dharmesh Shah, Group Vice President, Global Sales Execution. Plaintiff had worked previously and extensively with both of them over his six years at Gartner.

201.    Plaintiff told them both via Microsoft Teams chat on February 27, 2024 that he had rejoined Mr. Bourassa's team, what he would be doing and how much he looked forward to working with them again. On February 28, 2024, before Plaintiff's systems were shut off, both Mr. Chalk and Mr. Shah each responded over Microsoft Teams chat. Michael Chalk said "Hey Rob – that is great, congrats! And oh yes, a lot conversations happening on ITL Retention…So sure we will be talking quite frequently [smiley face]. Joining an ITL Retention call right now as a matter of fact." Dharmesh Shah said "Hey Rob – so great to hear from you after a long time – Congratulations on your new role and looking forward to picking up the thread on ITL and continue our partnership!"

202.    Despite Mr. Bourassa first promising that Plaintiff was guaranteed employment except for just cause, and Mr. Bourassa then fabricating concerns about Plaintiff's ability to "collaborate with Team NCVI partners," the two most high profile partners Plaintiff would be working with responded very positively to the news of his new position. This is direct evidence that the Defendant's proffered reason for termination, i.e., "sudden unexplained inability to collaborate" was a complete pretext for unlawful termination based on sex, age, and in retaliation for protected reports of discrimination.

203.    Another source of concern arose when Plaintiff spoke with two people on Mr. Bourassa's team on February 27, 2024. Atreyi Ray and Justin Bocian, both of whom Plaintiff knew well from his prior stint working for Mr. Bourassa, report directly to Mr. Bourassa. Specifically, when Plaintiff spoke with Mr. Bocian on February 27, 2024, he said he found it strange that Mr. Bourassa hadn't said anything about Plaintiff joining the team. And then Plaintiff asked when the next team meeting was and said perhaps Mr. Bourassa was waiting until then to introduce Plaintiff. Mr. Bocian said, "That's the weird thing. The weekly team meeting was yesterday." This meant that there had been a full team meeting on February 26, 2024, the day prior to Plaintiff's conversation with Mr. Bocian. Plaintiff found it highly disturbing that Mr. Bourassa hadn't invited Plaintiff to the team meeting. Though Plaintiff and Mr. Bourassa had been in touch the week before when they were both out of the office on vacation and Mr. Bourassa applauded Plaintiff's efforts to be proactive, the first day back in the office he did not invite Plaintiff to his weekly team meeting to introduce him.

204.    Plaintiff has been deeply traumatized by the discrimination, harassment, and retaliation that he has endured in connection with his unlawful termination from Gartner. First, Plaintiff was told his role was "eliminated" on January 9, 2024 for reasons that had absolutely nothing to do with his performance. Then Plaintiff was told he was free to look for a new position within Gartner. While dealing with the trauma of a job loss and uncertain future, Plaintiff began looking for jobs both internally and externally. Then after several weeks Plaintiff was hired back and promised continued employment except for just cause termination as of February 19, 2024, although with an undeserved demotion, a pay cut, and in a role that had no direct reports.

205.    Then after only two days on the job (February 26 and February 27, 2024) and without any announcement having been made of Plaintiff's return to the team, Plaintiff was let go for

reasons that no one would explain beyond some vague notion that mysterious "new information" cast doubt on Plaintiff's ability to "collaborate."

206.    Lastly, Plaintiff had a conversation with his old direct report, James Derr, on February 27, 2024, to let him know he would be staying at Gartner. Mr. Derr congratulated Plaintiff and said, "You won't believe this. Eric is opening a new VP role under him to do what you used to do on the team and I (James) will report to that person when they are hired." After Plaintiff's role on his prior team was allegedly "eliminated," it was actually reinstated.

207.    In what is clearly pay-back from Mr. Pautz, the blatantly pretextual reason for Plaintiff's termination, in spite of superlative performance, is Plaintiff's putative inability to "collaborate" with others. This is part of the precise criticism Plaintiff raised about Mr. Pautz's performance due to his outrageous behavior in the year end feedback Plaintiff gave Mr. Pautz in 2023. This absurdly pretextual termination is nothing more than Gartner's targeted retaliation for Plaintiff's reports of the abuses of Mr. Pautz, a younger executive.

208.    As further evidence of the absurdity of the claim that Plaintiff has problems collaborating, one need look no further than Plaintiff's review provided to him by Mr. Wartinbee in early 2023 based on Plaintiff's work in 2022 – which for the last 5 months of that year Plaintiff reported directly to Mr. Wartinbee so he has direct personal knowledge of the matters he comments on. This is also a reflection of Plaintiff's performance right up to the moment Mr. Pautz became Plaintiff's manager in January 2023. The second bullet in the review under the "What you are doing really well" section contains the following: (1) "Strong collaboration and partnership across Sales and Team NCVI"; (2) "Rob is very conscious of the sensitive position our team is put in oftentimes and is great at providing immediate coaching to team members to ensure we are well positioned in the Team NCVI and sales eyes."; (3) "Very collaborative and

interested in developing initiatives together."; (4) "I appreciate Rob's partnership on the business!"; (5) "Rob has a highly collaborative approach in working across Sales and Service. Examples are the RLC, his input on our Self-directed Service Delivery Model, and the Sales playbook being put together by his team."; (6) "Rob is a great connector and cultivator of relationships. He does a great job of bringing together the 'right' people to define and solve problems."; (7) "Rob does a great job collaborating across the business and pulling in the necessary business partners to represent both GBS and GTS. He's building a great team to be able to focus on the seller experience."

209.    The points quoted above above reflect direct quotes from Team NCVI partners according to Mr. Wartinbee. The theme of being a notably and uniquely strong collaborator across Team NCVI is reflected in Plaintiff's reviews going back over the prior 5 years before Plaintiff worked for Mr. Pautz. Somehow, not only did Plaintiff suffer severe emotional trauma and a hostile work environment working for Mr. Pautz, Plaintiff also somehow lost his ability to collaborate after 5 years of it being a consistent core strength.

210.    Finally, as Plaintiff had been offered, accepted and started a new position within Gartner, he was entitled to the same protections all employees receive when there are concerns about their "ability to do the job." Having led performance related processes with direct reports of his own on numerous occasions, Plaintiff knows the process includes a period of intensified coaching followed by a performance improvement plan. On the contrary, in Plaintiff's case, he was summarily dismissed after two days on the job over fabricated concerns that he won't be able to "collaborate" well enough to do the job.

211.    Even if there had been some validity to the claim of a deficiency in Plaintiff's ability to collaborate, which there most certainly was not, Gartner singled Plaintiff out and failed to afford

him the same protections provided to other younger and female employees when an area for improvement has been identified.

## IV.    CAUSES OF ACTION

<u>**COUNT ONE**</u>

<u>**DISCRIMINATION BASED ON SEX**</u>
<u>**IN VIOLATION OF TITLE VII**</u>

212.    Plaintiff repleads, realleges and incorporates by reference paragraphs 1 through 211 above, as though fully set forth herein.

213.    Plaintiff was discriminated against based on his sex in that he was subjected to disparate treatment based on his gender as a male.

214.    As a male, the Plaintiff was a member of a protected class.

215.    Plaintiff was otherwise highly qualified for his position and he had been an exemplary employee of the Defendant.

216.    Plaintiff suffered adverse employment actions based on his sex as set forth above in that the Defendant: (1) treated female and younger colleagues better than the Plaintiff; (2) stripped Plaintiff of duties and direct reports to give them to his female favorites; (3) expressed direct preference for working with female employees as opposed to male employees; (4) provided information, guidance and resources to female employees but not to the Plaintiff; and (5) terminated Plaintiff in favor of similarly situated female executives who were equally or less qualified and experienced than the Plaintiff.

217.    Plaintiff further suffered the adverse employment actions of termination and reduced compensation in exchange for exemplary performance as compared to his similarly situated female comparators.

218.     All of the adverse employment actions set forth above took place under circumstances that give rise to an inference of sex discrimination.

219.     Because Defendant, acting by and through one of its most senior executives, Mr. Pautz, expressed directly to the Plaintiff that his biased view was that female executives were better to work with because Mr. Pautz liked to make sexually suggestive remarks about female executives such as saying he wants to, "get lovely all over" the female executives.

220.      The Defendant cannot provide a legitimate, non-discriminatory reason for terminating Plaintiff's employment. The proffered reason for termination that the Plaintiff went from "E" ratings and praise of his collaborative skills to being "unable to collaborate with partners" is unsupportable by any facts.

221.     Plaintiff can successfully demonstrate that there is no factual basis for any alleged claim of poor collaboration skills or performance and any rationale given by Defendant for Plaintiff's termination is a mere pretext for discrimination and the clearly expressed sexual bias of Mr. Pautz.

222.      Defendant has unlawfully and willfully discriminated against the Plaintiff substantially because of his sex with regard to the terms, conditions, opportunities and privileges of his employment in violation of Title VII.

223.     The Defendant's adverse employment actions against the Plaintiff as set forth above, occurred under circumstances giving rise to an inference of sex discrimination.

224.     As a result of the Defendant's unlawful conduct as aforesaid, Plaintiff has sustained and will in the future sustain financial loss, including lost wages and severe impairment to his career and future career opportunities and earnings capacity.

225.    Plaintiff is entitled to compensation for lost wages including front and back pay, punitive damages, emotional distress damages, and attorney's fees and costs as a result of the Defendant's discriminatory actions based on gender.

226.    Sexual harassment and discrimination claims are not subject to mandatory arbitration provisions.

## COUNT TWO

## DISCRIMINATION BASED ON SEX IN VIOLATION OF CFEPA

227.    Plaintiff repleads, realleges and incorporates by reference paragraphs 1 through 226 above, as though fully set forth herein.

228.    Plaintiff was discriminated against based on his sex in that he was subjected to disparate treatment based on his gender as a male.

229.    As a male, the Plaintiff was a member of a protected class.

230.    Plaintiff was otherwise highly qualified for his position and he had been an exemplary employee of the Defendant.

231.    Plaintiff suffered adverse employment actions based on his sex as set forth above in that the Defendant: (1) treated female and younger colleagues better than the Plaintiff; (2) stripped Plaintiff of duties and direct reports to give them to his female favorites; (3) expressed direct preference for working with female employees as opposed to male employees; (4) provided information, guidance and resources to female employees but not to the Plaintiff; and (5) terminated Plaintiff in favor of similarly situated female executives who were equally or less qualified and experienced than the Plaintiff.

232.    Plaintiff further suffered the adverse employment actions of termination and reduced compensation in exchange for exemplary performance as compared to his similarly situated female comparators.

233.    All of the adverse employment actions set forth above took place under circumstances that give rise to an inference of sex discrimination.

234.    Because Defendant, acting by and through one of its most senior executives, Mr. Pautz, expressed directly to the Plaintiff that his biased view was that female executives were better to work with because Mr. Pautz liked to make sexually suggestive remarks about female executives such as saying he wants to, "get lovely all over" the female executives.

235.     The Defendant cannot provide a legitimate, non-discriminatory reason for terminating Plaintiff's employment. The proffered reason for termination that the Plaintiff went from "E" ratings and praise of his collaborative skills to being "unable to collaborate with partners" within a few short months is unsupportable by any facts.

236.    Plaintiff can successfully demonstrate that there is no factual basis for any alleged claim of poor collaboration skills or performance and any rationale given by Defendant for Plaintiff's termination is a mere pretext for discrimination and the clearly expressed sexual bias of Mr. Pautz.

237.     Defendant has unlawfully and willfully discriminated against the Plaintiff substantially because of his sex with regard to the terms, conditions, opportunities and privileges of his employment, as set forth herein above in violation of CFEPA.

238.    The Defendant's adverse employment actions against the Plaintiff as set forth above, occurred under circumstances giving rise to an inference of sex discrimination.

239.    As a result of the Defendant's unlawful conduct as aforesaid, Plaintiff has sustained and will in the future sustain financial loss, including lost wages and severe impairment to his career and future career opportunities and earnings capacity.

240.    Plaintiff is entitled to compensation for lost wages including front and back pay, punitive damages, emotional distress, and attorney's fees and costs as a result of the Defendant's discriminatory actions based on sex.

241.    Sexual harassment and discrimination claims are not subject to mandatory arbitration provisions.

## COUNT THREE

## HOSTILE WORK ENVIRONMENT BASED ON SEX IN VIOLATION OF TITLE VII

242.    Plaintiff repleads, realleges and incorporates by reference paragraphs 1 through 241 above, as though fully set forth herein.

243.    Due to the unwanted sexually charged jokes, insults, innuendo, and explicit sexual discussions about colleagues with the Plaintiff set forth in more detail hereinabove, Mr. Pautz created a workplace that was so permeated with sexual intimidation that was sufficiently severe and pervasive that it altered the conditions of the Plaintiff's employment and interfered with Plaintiff's ability to do his job.

244.    The conduct included direct statements from Mr. Pautz that the Plaintiff was and should engage in explicit sexual acts with other colleagues, including such obscene instructions for the Plaintiff to keep, "tossing the salad" with other employees.

245.    There is a specific basis to impute the conduct by Mr. Pautz that created the sexually hostile environment for the Plaintiff to the Defendant in this case.

246.    Mr. Pautz was not only Plaintiff's supervisor but also a high-ranking executive officer in Defendant's senior management. All of the actions committed by Mr. Pautz are attributable to Gartner as he was their agent, servant, and employee at all times described hereinabove while acting within the scope of his employment. Defendant is directly liable for the damages caused to the Plaintiff by Mr. Pautz's obscene antics used in managing the Plaintiff.

247.    The pervasive sexual jokes and comments which created the sexually hostile work environment for the Plaintiff and which is attributable to Defendant was a violation of Title VII.

248.    The sexually hostile work environment that changed the Plaintiff's working conditions caused the Plaintiff to suffer severe emotional distress and mental anguish for which he has sought and is likely to continue to require medical treatment.

## COUNT FOUR

## HOSTILE WORK ENVIRONEMNT BASED ON SEX IN VIOLATION OF CFEPA

249.    Plaintiff repleads, realleges and incorporates by reference paragraphs 1 through 248 above, as though fully set forth herein.

250.    Due to the unwanted sexually charged jokes, insults, innuendo, and explicit sexual discussions about colleagues with the Plaintiff set forth in more detail hereinabove, Mr. Pautz created a workplace that was so permeated with sexual intimidation that was sufficiently severe and pervasive that it altered the conditions of the Plaintiff's employment and interfered with Plaintiff's ability to do his job.

251.    The conduct included direct statements from Mr. Pautz that the Plaintiff was and should engage in explicit sexual acts with other colleagues, including such obscene instructions for the Plaintiff to keep, "tossing the salad" with other employees.

252.    There is a specific basis to impute the conduct by Mr. Pautz that created the sexually hostile environment for the Plaintiff to the Defendant in this case.

253.    Mr. Pautz was not only Plaintiff's supervisor but also a high-ranking executive officer in Defendant's senior management. All of the actions committed by Mr. Pautz are attributable to Gartner as he was their agent, servant, and employee at all times described hereinabove while acting within the scope of his employment. Defendant is directly liable for the damages caused to the Plaintiff by Mr. Pautz's obscene antics used in managing the Plaintiff.

254.    The pervasive sexual jokes and comments which created the sexually hostile work environment for the Plaintiff and which is attributable to Defendant was a violation of CFEPA.

255.    The sexually hostile work environment that changed the Plaintiff's working conditions caused the Plaintiff to suffer severe emotional distress and mental anguish for which he has sought and is likely to continue to require medical treatment.

## COUNT FIVE
### AGE DISCRIMINATION UNDER THE ADEA

256.    Plaintiff hereby repeats and realleges Paragraphs 1 to 255 of this Complaint as if fully set forth herein.

257.    The Plaintiff, age 53 on the date of his termination, was at all relevant times a highly qualified and competent employee of the Defendant, and a covered person pursuant to the ADEA.

258.    Plaintiff was subjected to a series of adverse employment actions as described herein above, including but not limited to unequal treatment because of his age, denial of the rights and privileges of his position and wrongful termination of his employment based on his age.

259.     The Defendant, acting by and through one of its senior corporate officers, Mr. Pautz, directly expressed discriminatory animus against the Plaintiff based solely on his age as described hereinabove.

260.     The Defendant's stated reason for the termination of the Plaintiff is pretextual because it is without any factual basis, it is arbitrary, capricious, and it violates the Defendant's own human resources policies. There is no legitimate non-discriminatory reason for the Plaintiff's termination.  The reason stated by the Defendant is false and pretextual to attempt to justify the age-based termination decision made by Mr. Pautz.

261.     The Plaintiff was denied equal treatment in the terms, conditions and privileges of his employment as stated herein above on account of his age in that he was demoted, then terminated without cause or notice in favor of younger employees and in that he was treated differently than similarly situated younger employees throughout his tenure as described hereinabove.

262.     The Plaintiff's age was the sole contributing or motivating factor for all of the adverse employment actions alleged herein.

263.     At all relevant times, the Plaintiff was performing his duties competently, was highly qualified for his position, and was in compliance with the reasonable performance expectations of the Defendant.

264.     The adverse employment actions alleged hereinabove occurred under circumstances giving rise to an inference of age discrimination.

265.     On information and belief, the Defendant, acting through Mr. Pautz and as observed directly by the Plaintiff, exhibited a pattern and practice of age discrimination. The Defendant

discriminated against older workers in favor of hiring, retaining, promoting and employing younger workers.

266.    As a direct result of the Defendant's disparate treatment of the Plaintiff based on his age in violation of the ADEA, the Plaintiff suffered loss of wages, loss of benefits, loss of career opportunities, damage to his reputation, loss of status and inability to locate suitable replacement employment, all to his loss and damage.

## COUNT SIX: AGE DISCRIMINATION IN VIOLATION OF THE CFEPA

267.    Plaintiff repeats and realleges the allegations of Paragraphs 1 through 266, as if fully set forth herein.

268.    The Plaintiff, age 53 on the date of his termination, was at all relevant times a highly qualified and competent employee of the Defendant, and a covered person pursuant to the CFEPA.

269.    Plaintiff was subjected to a series of adverse employment actions as described herein above, including but not limited to unequal treatment because of his age, denial of the rights and privileges of his position and wrongful termination of his employment based on his age.

270.    The Defendant, acting by and through one of its senior corporate officers, Mr. Pautz, directly expressed discriminatory animus against the Plaintiff based substantially but not solely on his age as described hereinabove.

271.    The Defendant's stated reason for the termination of the Plaintiff is pretextual because it is without any factual basis, it is arbitrary, capricious, and it violates the Defendant's own human resources policies. There is no legitimate non-discriminatory reason for the Plaintiff's termination.  The reason stated by the Defendant is false and pretextual to attempt to justify the age-based termination decision made by Mr. Pautz.

272.    The Plaintiff was denied equal treatment in the terms, conditions and privileges of his employment as stated herein above on account of his age in that he was demoted, then terminated without cause or notice in favor of younger employees and in that he was treated differently than similarly situated younger employees throughout his tenure as described hereinabove.

273.    The Plaintiff's age was a substantial contributing or motivating factor for all of the adverse employment actions alleged hereinabove.

274.    At all relevant times, the Plaintiff was performing his duties competently, was highly qualified for his position, and was in compliance with the reasonable performance expectations of the Defendant.

275.    The adverse employment actions alleged hereinabove occurred under circumstances giving rise to an inference of age discrimination.

276.    On information and belief, the Defendant, acting through Mr. Pautz and as observed directly by the Plaintiff, exhibited a pattern and practice of age discrimination. The Defendant discriminated against older workers in favor of hiring, retaining, promoting and employing younger workers.

277.    As a direct result of the Defendant's disparate treatment of the Plaintiff based on his age in violation of the CFEPA, the Plaintiff suffered loss of wages, loss of benefits, loss of career opportunities, damage to his reputation, loss of status and inability to locate suitable replacement employment, all to his loss and damage.

### COUNT SEVEN

### ILLEGAL RETALIATION IN VIOLATION OF THE ADEA

278.    Plaintiff hereby repeats and realleges Paragraphs 1 to 277 of this Complaint as if fully set forth herein.

279.    Plaintiff engaged in an activity protected under the ADEA when he complained about the discrimination and harassment he was experiencing at Defendant based on his age.

280.    Defendant, acting at all times described above by and through its senior management officer Mr. Pautz, was aware of Plaintiff's complaints and was provided with substantial notice of them.

281.    Defendant retaliated and took adverse action against Plaintiff when it removed his projects and employees and gave them to other employees as described hereinabove.

282.    Defendant further retaliated against the Plaintiff for his protected complaints of discrimination and harassment by terminating him for absurd and arbitrary reasons intended to cover up the retaliatory nature of the Plaintiff's termination.

283.    A causal connection exists between Defendant's adverse retaliatory actions against the Plaintiff and the protected activity of reporting discrimination including through temporal proximity between the adverse actions and the protected activity and in the circumstances which reveal the retaliatory animus by the Defendant's officer Mr. Pautz.

284.    Defendant cannot and has not offered a legitimate non-discriminatory reason for the adverse actions taken against Plaintiff.  Plaintiff was an extremely high-performing employee, and any proffered explanation by Defendant for such adverse actions is a pretext for unlawful retaliation.

285.    Defendant's retaliatory actions as described hereinabove constitute a violation of the

ADEA.

286.    The retaliation by the Defendant has caused the Plaintiff to suffer losses and damages including lost wages, severe emotional distress and lost earning capacity.

## COUNT EIGHT

## ILLEGAL RETALIATION FOR PROTECTED

## ACTIVITY UNDER TITLE VII

287.    Plaintiff hereby repeats and realleges Paragraphs 1 to 286 of this Complaint as if fully set forth herein.

288.    Plaintiff engaged in an activity protected under the Title VII when he complained about the discrimination and harassment he was experiencing at Defendant based on his sex.

289.    Defendant, acting at all times described above by and through its senior management officer Mr. Pautz, was aware of Plaintiff's complaints and was provided with substantial notice of them.

290.    Defendant retaliated and took adverse action against Plaintiff when it removed his projects and employees and gave them to other employees as described hereinabove.

291.    Defendant further retaliated against the Plaintiff for his protected complaints of discrimination and harassment by terminating him for absurd and arbitrary reasons intended to cover up the unlawful retaliatory nature of the Plaintiff's termination.

292.    A causal connection exists between Defendant's adverse retaliatory actions against the Plaintiff and the protected activity of reporting discrimination including through temporal proximity between the adverse actions and the protected activity and in the circumstances which reveal the retaliatory animus by the Defendant's officer Mr. Pautz.

293.    Defendant cannot and has not offered a legitimate non-discriminatory reason for the

adverse actions taken against Plaintiff.  Plaintiff was an extremely high-performing employee, and any proffered explanation by Defendant for such adverse actions is a pretext for unlawful retaliation.

294.    Defendant's retaliatory actions as described hereinabove constitute a violation of the Title VII.

295.    The retaliation by the Defendant has caused the Plaintiff to suffer losses and damages including lost wages, severe emotional distress and lost earning capacity.

## COUNT NINE

## ILLEGAL RETALIATION FOR PROTECTED ACTIVITY UNDER CFEPA

296.    Plaintiff repeats and realleges Paragraphs 1 to 295 of this Complaint as if fully set forth herein.

297.    Plaintiff engaged in an activity protected under the CFEPA when he complained about the discrimination and harassment he was experiencing at Defendant based on his age and his sex.

298.    Defendant, acting at all times described above by and through its senior management officer Mr. Pautz, was aware of Plaintiff's complaints and was provided with substantial notice of them.

299.    Defendant retaliated and took adverse action against Plaintiff when it removed his projects and employees and gave them to other employees as described hereinabove.

300.    Defendant further retaliated against the Plaintiff for his protected complaints of discrimination and harassment by terminating him for absurd and arbitrary reasons intended to cover up the retaliatory nature of the Plaintiff's termination.

301.    A causal connection exists between Defendant's adverse retaliatory actions against the

Plaintiff and the protected activity of reporting discrimination including through temporal proximity between the adverse actions and the protected activity and in the circumstances which reveal the retaliatory animus by the Defendant's officer Mr. Pautz.

302.    Defendant cannot and has not offered a legitimate non-discriminatory reason for the adverse actions taken against Plaintiff.  Plaintiff was an extremely high-performing employee, and any proffered explanation by Defendant for such adverse actions is a pretext for unlawful retaliation.

303.    Defendant's retaliatory actions as described hereinabove constitute a violation of the CFEPA.

304.    The retaliation by the Defendant has caused the Plaintiff to suffer losses and damages including lost wages, severe emotional distress and lost earning capacity.

## COUNT TEN

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

305.    Plaintiff repleads, realleges and incorporates by reference paragraphs 1 through 304 above, as though fully set forth herein.

306.    As set forth in detail hereinabove, the Defendant's conduct towards the Plaintiff created an unreasonable risk of causing the Plaintiff emotional distress and did in fact cause such distress.

307.    The Plaintiff's distress was foreseeable by the Defendant and the emotional distress was severe enough that it might result in illness or bodily harm to the Plaintiff.

308.    The Defendant's conduct as set forth above was the cause of the Plaintiff's distress. Said distress was caused by the Defendant in the course of its termination of the Plaintiff.

309.    Defendant's conduct in terminating the Plaintiff based on false assertions about his ability

to collaborate as well as the insulting and degrading sexual jokes made at Plaintiff's expense by Mr. Pautz, was so extreme and outrageous that it altered the Plaintiff's working conditions and caused undue emotional distress.

310.    The Defendant had a duty of ordinary care in the manner in which it conducted its termination of employees such as the Plaintiff. This duty was based on the employee employer relationship.

311.    The Defendant breached its duty of ordinary care in its misconduct towards the Plaintiff in the course of its termination of his employment as aforesaid.

312.    As a direct result of the Defendant's negligent and careless actions as aforesaid, the Plaintiff suffered emotional distress including depression, anxiety, loss of sleep, mental anguish, and loss of life's enjoyments, all to his loss and damage.

313.    As a further direct result of the Defendant's negligent and careless actions as aforesaid, the Plaintiff was caused to incur medical expenses and is likely to continue to require medical treatment and expenses, all to his loss and damage.

## COUNT ELEVEN

## INTENTIONAL INFLCITION OF EMOTIONAL DISTRESS

314.    Plaintiff repleads, realleges and incorporates by reference paragraphs 1 through 313 above, as though fully set forth herein.

315.    Defendant, acting by and through its senior management officer Mr. Pautz, knew or should have known that severe emotional distress was a likely outcome of its discriminatory and retaliatory conduct towards the Plaintiff as described more fully hereinabove.

316.    Defendant's intentional discriminatory and retaliatory conduct resulted in Plaintiff's wrongful and unlawful termination which was conducted in such a duplicitous and abusive

manner that severe emotional distress was inflicted upon the Plaintiff up to and including the time of his termination.

317.    Defendant's conduct as set forth above caused the Plaintiff severe emotional distress which was likely to and did in fact cause the Plaintiff harm.

318.    Defendant's persistent and pervasive conduct and treatment of Plaintiff was intentional and so severe that Defendant should have known that it would result in extreme emotional distress, and in fact it did result in Plaintiff's extreme emotional distress.

319.    The emotional distress inflicted on the Plaintiff by the Defendant has caused the Plaintiff to suffer losses and damages including severe emotional distress damages, lost wages and lost earning capacity.

## COUNT TWELVE

## BREACH OF EMPLOYMENT CONTRACT

320.    Plaintiff repleads, realleges and incorporates by reference paragraphs 1 through 319 above, as though fully set forth herein.

321.    On or around February 16, 2024 the Plaintiff and Defendant entered into an employment agreement for the position of Vice President which was memorialized in various email communications and conversations between Plaintiff and Defendant officers such as Mr. Bourassa as described in detail hereinabove.

322.    The aforesaid employment agreement dated February 16, 2024 ("the Agreement") set forth terms of compensation and duties of employment. Said Agreement included an express promise from Mr. Bourassa that the Plaintiff would be guaranteed continued employment except for just cause as set forth above.

323.    The Defendant had a duty to use good faith and fair dealing to fulfill its

contractual obligations with Plaintiff.

324.    Plaintiff justifiably relied on Defendant not to engage in bad faith actions to deprive him of the benefits of his employment Agreement including his guarantee of employment.

325.    At all relevant times, the Plaintiff fully performed his obligations under the aforesaid Agreement.

326.    On or around February 28, 2024, the Defendant breached its aforesaid Agreement with the Plaintiff in that it terminated without just cause immediately after hiring him, just as the Plaintiff had feared and expressed to Mr. Bourassa during negotiations of the terms of employment.

327.    Mr. Bourassa responded with a specific promise that the position Plaintiff was being offered was not subject to withdrawal without just cause. Mr. Bourassa made the promise of just cause employment in response to the Plaintiff's fears of such an unjust and sudden termination. Mr. Bourassa made that promise to the Plaintiff when he specifically said: "Oh Rob you don't need to worry about anything. I'm in this for the long haul. That won't happen. If anything, I'll be expanding your role. Just trust me." Plaintiff justifiably relied upon such promises to his detriment.

328.    As a result of Defendant's breach of its agreement to provide continued employment for Plaintiff except for just cause, Plaintiff has been, and continues to suffer damages and losses in the form of lost wages, lost benefits, and benefits and bonus compensation in an amount to be determined at trial.

## V.    <u>PRAYER FOR RELIEF</u>

**WHEREFORE,** Plaintiff hereby requests the following relief:

A.      Award of compensatory money damages for lost incentives, benefits, wages, and

earnings;

B.      Award of punitive damages for fraudulent and reckless conduct;

C.      Award attorneys' fees and costs pursuant to state and federal statutes herein;

D.      Award pre-judgement interest;

E.      Award post-judgement interest;

F.      Award of compensatory money damages for severe emotional distress; and

G.      Award such other relief in law or equity as this Court deems appropriate.

## **JURY TRIAL DEMANDED**

Plaintiff respectfully requests a jury trial on all questions of fact raised by his Complaint.

Respectfully Submitted,

ROBERT MALKANI,
PLAINTIFF

By:/s/ Mark P. Carey
Mark P. Carey (ct17828)
Carey & Associates, P.C.
71 Old Post Road, Suite One
Southport, CT 06890
(203) 255-4150 tel
(203) 255-0380 fax
mcapclaw.com@capclaw.com
HIS ATTORNEYS

# EXHIBIT A

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Boston Area Office**
15 New Dudbury St, Room 475
Boston, MA 02203
(617) 865-3670
Website: www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 04/25/2024

**To:** Robert Malkani
13 Ridgeland Terrace
Rye, NY 10580
Charge No: 523-2024-01999

EEOC Representative and email:    NICOLE BUTLER
Investigator
nicole.butler@eeoc.gov

### DISMISSAL OF CHARGE

The EEOC has granted your request that the agency issue a Notice of Right to Sue, where it is unlikely that EEOC will be able to complete its investigation within 180 days from the date the charge was filed.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 523-2024-01999.

On behalf of the Commission,

Digitally Signed By:Feng K. An
04/25/2024
Feng K. An
Area Office Director

# EXHIBIT B



**STATE OF CONNECTICUT
COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES**

**Robert Malkani**
COMPLAINANT

CHRO No. 2420369

vs.

EEOC No. 523-2024-01999

**Gartner Inc.**
RESPONDENT

## RELEASE OF JURISDICTION

The Commission on Human Rights and Opportunities hereby releases its jurisdiction over the above-identified complaint. The Complainant is authorized to commence a civil action in accordance with CONN. GEN. STAT. § 46a-100 against the Respondent in the Superior Court for the judicial district in which the discriminatory practice is alleged to have occurred, in which the Respondent transacts business or in which the Complainant resides. If this action involves a state agency or official, it may be brought in the Superior Court for the judicial district of Hartford.

A copy of any civil action brought pursuant to this release must be served on the Commission at ROJ@ct.gov or at 450 Columbus Blvd., Suite 2, Hartford, CT 06103 at the same time all other parties are served. Electronic service is preferred. **THE COMMISSION MUST BE SERVED BECAUSE IT HAS A RIGHT TO INTERVENE IN ANY ACTION BASED ON A RELEASE OF JURISDICTION PURSUANT TO CONN. GEN. STAT. § 46a-103.**

The Complainant must bring an action in Superior Court within 90 days of receipt of this release and within two years of the date of filing the complaint with the Commission unless circumstances tolling the statute of limitations are present.

**DATE: 5/22/2024**

*Tanya A. Hughes*
Tanya A. Hughes, Executive Director

Service:
Complainant:               Robert Malkani, via Email: robert.malkani@Gmail.com
Complainant's Attorney:    Christopher S. Avcollie, Esq., via Email: cavcollie@capclaw.com
Respondent's Contact:      Joshua Walls, via Email: Joshua.Walls@gartner.com
Respondent's Attorney:     Keegan A. Drenosky, Esq., via Email: KDrenosky@goodwin.com