UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - x
                                :
ROBERT MALKANI,                 :  No. 3:24CV1009(JAM)
                                :
              Plaintiff         :
                                :
         v.                     :
                                :
GARTNER, INC.,                  :
                                :  New Haven, Connecticut
              Defendant         :  November 1, 2024
                                :
- - - - - - - - - - - - - - - - x
```

MOTIONS HEARING

B E F O R E:

THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.

A P P E A R A N C E S:

FOR THE PLAINTIFF:

      CAREY & ASSOCIATES PC
         71 Old Post Road
         Southport, Connecticut 06890
      BY:  CHRISTOPHER S. AVCOLLIE, ESQ.
         MARK PAUL CAREY, ESQ.

FOR THE DEFENDANT:

      SHIPMAN & GOODWIN
         One Constitution Plaza
         Hartford, Connecticut 06103
      BY:  KEEGAN A. DRENOSKY, ESQ.
         DANIEL ADAM SCHWARTZ, ESQ.

Diana Huntington, RDR, CRR
Official Court Reporter

1                      **8:22 A.M.**

2              THE COURT:  We're here today on pending motions

3    in Malkani v. Gartner, Inc.

4              May I have the appearance of counsel, please,

5    for the plaintiff.

6              MR. AVCOLLIE:  Good morning, Your Honor.

7    Christopher Avcollie with Carey & Associates for the

8    plaintiff.  To my right, Robert Malkani.

9              MR. CAREY:  Mark Carey, Your Honor.

10             THE COURT:  Good morning.

11             And how do I pronounce that?

12             MR. AVCOLLIE:  Avcollie, sir.

13             THE COURT:  Okay, great.  Welcome to all of you.

14             And for Gartner?

15             MS. DRENOSKY:  Good morning, Your Honor.  Keegan

16   Drenosky for the defendant Gartner.  And to my left is my

17   colleague Daniel Schwartz.

18             We appreciate the invitation to have our client

19   be here today.  Unfortunately, he was in a car accident on

20   the way here.

21             THE COURT:  I'm very sad to hear that.

22             MS. DRENOSKY:  Everyone's fine.  We did

23   appreciate the invitation.

24             THE COURT:  Of course, of course.  Please be

25   seated.

```
 1              As you can see, we have quite a few other people
 2    here today as well from Professor Harold Koh's first-year
 3    civil procedure class.  I wanted to thank counsel for
 4    their being willing to accommodate the attendance of so
 5    many people at the court proceeding today.  Hopefully, it
 6    will let aspiring and growing and budding lawyers learn
 7    and see much about how federal courts work today.
 8              So, Ms. Drenosky, would you like to start off
 9    with respect to your motion to dismiss?
10              MS. DRENOSKY:  Yes.  Thank you, Your Honor.
11              So, given that we have some guests, I am going
12    to give a brief overview of the case to give some
13    background here.
14              So, plaintiff is a former managing vice
15    president of sales at Gartner and alleges that beginning
16    in 2023 his new supervisor, Mr. Pautz, treated him
17    unequally in comparison to his younger female colleagues
18    and ultimately that he was terminated for discriminatory
19    and retaliatory reasons.
20              Here, Gartner has moved to compel almost all of
21    plaintiff's claims to arbitration, a motion that we submit
22    would normally be unceremoniously granted based on a valid
23    binding arbitration clause between the parties that hasn't
24    been challenged here.  But recently in 2022 Congress has
25    enacted the Ending Forced Arbitration of Sexual Assault
```

1    and Sexual Harassment Act which, if the Court will permit

2    me, I am going to refer to as the EFAA because that is a

3    mouthful.

4              THE COURT:  Sure.

5              MS. DRENOSKY:  Essentially, that Act says that

6    employees, including plaintiff, can no longer be forced to

7    compel their claims to arbitration with respect to sexual

8    assault and sexual harassment disputes.  Plaintiff is well

9    aware of this law and has thus attempted to allege claims

10   of sexual harassment here to avoid this arbitration

11   provision and trying to shoehorn, essentially, all of his

12   claims before this Court and out of arbitration.

13             Ultimately, we submit this tactic shouldn't be

14   successful here as his claims of sexual harassment are

15   frivolous and other courts in this circuit that have

16   considered the EFAA statute have held that this applies

17   only to sexual harassment claims that have been plausibly

18   pleaded.  So it has to meet a plausibility standard in

19   order to trigger the EFAA.  Indeed, these courts have

20   compelled such cases to arbitration after dismissing

21   frivolous claims relating to sexual harassment.

22             So, here, Gartner's moved to dismiss Counts

23   Three and Four, it's a very targeted motion, which we

24   submit are the only claims relating to sexual harassment,

25   arguably.  Simply put, Your Honor, at its core this case

1    is not about sexual harassment.  In the twelve-count,

2    328-paragraph complaint there's only a handful of

3    allegations that even relate allegedly to sexual

4    harassment, and those allegations are conclusory in

5    nature.

6              THE COURT:  Can I ask you this, maybe?  It looks

7    to me, I know your focus is on Counts Three and Four which

8    are I think, by your own reckoning, they would qualify as

9    claims of sexual harassment within the scope of the EFAA;

10   is that right?

11             MS. DRENOSKY:  EFAA.

12             THE COURT:  Sure.  It struck me that Counts

13   Eight and Nine which are retaliation for harassment, in

14   part, would also qualify.  Do I have that wrong?

15             MS. DRENOSKY:  Your Honor, you don't have that

16   wrong as a general principle.  Retaliation could relate to

17   a sexual harassment dispute with respect to the EFAA

18   statute.  However, here, it has not been adequately

19   alleged for several reasons.

20             The allegations that plaintiff complained about

21   sexual harassment just don't exist here.  There's

22   allegations that in December of 2023 Mr. Malkani made a

23   complaint to HR about unequal treatment, but the

24   allegation is vague.  There's no reference to specific

25   sexual harassing allegations.

1          Further, for the reasons that I'm sure I'm going

2    to discuss today, here there hasn't been an established

3    claim of hostile work environment sexual harassment, so

4    the claim of retaliation must fail for the same reason.

5          THE COURT:  So are you saying really that

6    Counts Eight and Nine, the retaliation claims, are not

7    plausibly alleged/plausibly pled as distinct from saying a

8    retaliation claim doesn't qualify at all, doesn't come

9    within the scope as a matter of law of a sexual harassment

10   dispute?

11         MS. DRENOSKY:  Your Honor, that's mostly

12   correct.  The only distinction I would make here is that

13   within the scope of the retaliation claim, I think here

14   specifically the sexual harassment element also needs to

15   be alleged.  We haven't moved to dismiss those retaliation

16   claims.  Again, this is a targeted motion.  So it may be

17   that plaintiff can state a claim for retaliation based on

18   protected activity, but that doesn't come within the

19   sexual harassment dispute definition for purposes of the

20   EFAA.  So even if he can continue with some sort of claim

21   of retaliation, he has a number of other claims here that

22   he's engaged in protected activity complaining about

23   discrimination, for instance, would not necessarily be

24   sexual harassment.

25         THE COURT:  I get that.  He's complaining about

1    age discrimination.

2            MS. DRENOSKY:  Correct, Your Honor.

3            THE COURT:  And there's retaliation for that.  I

4    can see why you would argue that.

5            I'm looking at paragraphs 288 and 297 of the

6    complaint, second paragraphs of Counts Eight and Nine,

7    retaliation counts.  And they both refer to the plaintiff

8    engaging in activity, protected activity about -- and they

9    use the word "harassment" for both of those.  And so it

10   struck me that -- and it says based on his age and sex.

11   So it seems to me a fair reading is he's alleging, among

12   other grounds for retaliation, it's based in part on his

13   complaining about sexual harassment.

14           MS. DRENOSKY:  Your Honor, even accepting that

15   allegation is true for purposes of a motion to dismiss, we

16   would submit that the conclusory statement there that this

17   is harassment, we have to look at all of the facts alleged

18   in the complaint.  Plaintiff makes the point that we can't

19   look at these individual counts in hermetically sealed

20   boxes, which I think we would agree with.  But here you

21   have to look at what are the underlying facts that have

22   been alleged to be harassment.

23           THE COURT:  It does seem to me, then, that what

24   you're saying is they use the right words but there's

25   still not enough facts that rise to the *Iqbal* level of

1    plausibly alleging retaliation --

2              MS. DRENOSKY:  Yes, that's correct, Your Honor.

3              THE COURT:  -- on grounds of sexual harassment.

4    Do I have that right?

5              MS. DRENOSKY:  Correct.

6              I understand that the Second Circuit recently

7    considered this issue in the *Olivieri* case.  In that case,

8    the court basically did say, look, a claim of retaliation

9    could be a sexual harassment dispute, but other courts

10   have now considered that case.  And I would point you to a

11   case in the Middle District of Florida, which I understand

12   is not binding on this Court, but they considered that

13   exact issue.  And they determined that in that *Olivieri*

14   case there was no issue as whether there was an underlying

15   allegation relating to sexual harassment, it was properly

16   pleaded.  And the court specifically held there that the

17   court agreed with defendant that "for a non-sexual

18   harassment claim - such as retaliation - to 'relate to'

19   the alleged sexual harassment dispute, [plaintiff] must

20   still allege conduct constituting actionable sexual

21   harassment under the law, regardless of whether a sexual

22   harassment claim is expressly asserted as a standalone

23   claim."

24             So, to Your Honor's point, we would agree that

25   that sexual harassment must still be adequately alleged.

1          THE COURT:  And remind me, what's that case?

2     It's outside of the Second Circuit?

3          MS. DRENOSKY:  It's *Mitchell v. Raymond James &*

4     *Asscs.*, and it's 2024 WL 4263151.

5          THE COURT:  I see.  Okay.

6          MS. DRENOSKY:  And because, Your Honor, I would

7     submit that some of these cases have come out after we did

8     our briefing, and to the extent that that is an issue that

9     the Court is very interested in and thinks might be a

10    determining factor in this motion, we'd be happy to submit

11    supplemental briefing.

12          THE COURT:  I intend to ask you to do that.

13          MS. DRENOSKY:  Happy to do so, Your Honor.

14          THE COURT:  Go ahead.  I interrupted you.  What

15    other points did you want to make?

16          MS. DRENOSKY:  That's fine.

17          Just getting back to the merits of the

18    allegations of sexual harassment, as we have submitted in

19    our motion to dismiss Counts Three and Four which again we

20    would argue would also relate to the retaliation claims,

21    there's a high burden to allege a hostile work

22    environment.  I'm sure the Court and, having read our

23    briefs, the audience is likely well aware that you need to

24    sufficiently allege severe and pervasive conduct that

25    actually alters the conditions of a plaintiff's

1   employment.  And there's a reasonable person standard

2   here.  So it's not just what the plaintiff subjectively

3   believes; it needs to be objectively hostile and abusive,

4   that a reasonable person would find to be so.  And courts

5   will look at things such as the frequency, severity of

6   comments or conduct, and whether it's threatening and

7   humiliating or if it's mere offensive utterance, and if it

8   unreasonably interferes with an employee's work

9   performance.

10          Here, in this case, plaintiff premises almost

11   the entire claim of sexual harassment on the use of benign

12   facially neutral statements like plaintiff should "grab

13   it" and that he should "do what he wants."  And most

14   egregiously, in our view, is "tossing word salad," which

15   if you read the complaint relates to a work project that

16   he was involved in at Gartner.  Specifically, the

17   allegation is that his supervisor said to him "you're

18   going to have to toss some word salad on this one,

19   Malkani.  You went to law school.  I bet you can toss some

20   word salad, right?"

21          Then the allegations go on to state that this

22   phrase, which was not even the next phrase alleged, that

23   "tossing the salad" -- so, again, a different phrase -- is

24   a well-known sexual slang reference without any factual

25   basis to support that to allow the Court to make that

1    inference.  We are purely asked to go on plaintiff's

2    say-so.  And that's the type of allegations that are

3    throughout the complaint.

4         In our view, this simply doesn't pass muster.

5    I'd point the Court to a number of cases we've cited in

6    our brief where the court has dismissed or granted summary

7    judgment on much more severe and pervasive type of conduct

8    than these facially neutral allegations.

9         Here, I would point out that the plaintiff also

10   attempted to add additional documents, extrinsic documents

11   in response to our motion to dismiss.  It's our position

12   that that is improper.  The law doesn't allow the

13   plaintiff to do that.  Even if we were to consider those

14   documents, they don't add anything here.  There's a

15   178-paragraph affidavit that's really just more

16   allegations.  So to the extent that plaintiff is relying

17   on those assertions, he could have amended his complaint.

18        There's a few other documents, a cherrypicked

19   email in a performance evaluation, that aren't integral to

20   the plaintiff's claims here.  To the extent the Court

21   wishes to review those, we'd submit the defendant also has

22   documents that could demonstrate what these phrases mean

23   in context that we should submit.  And really, that would

24   be more akin to a motion for summary judgment here.

25        But, ultimately, I would point the Court back to

1    that these other cases have looked at more severe and

2    pervasive allegations.  Specifically looking at the *Perry*

3    *v. Guerrieri* case, courts have rejected reliance on

4    nonsexual comments to establish a hostile work environment

5    claim when comments aren't on their face vulgar, obscene,

6    intimidating or threatening.  And here, that's what we

7    have: facially neutral comments, one hug, and some stray

8    remarks.  It doesn't come close to meeting the threshold.

9    And then whereas here there hasn't been an allegation of a

10   hostile work environment, no longer triggers the EFAA

11   because it doesn't come within that sexual harassment

12   dispute umbrella.

13           And just to wrap up and then I'll reserve the

14   rest of my time for rebuttal, I would point the Court to

15   the practical implications of this ruling.  If the Court

16   here, in our view, rules that all counts of this case are

17   properly exempted from a binding arbitration clause based

18   on this type of flimsy and sex neutral allegation, almost

19   any garden variety employment case could be exempted from

20   a bargained-for arbitration clause and, in our view, will

21   encourage frivolous and meritless claims for the sole

22   purpose of avoiding arbitration.  I can't imagine that

23   that was the intent of the legislature in drafting the

24   EFAA.  It was to protect victims of sexual harassment and

25   assault, not those looking to avoid arbitration agreements

 1    by throwing in some meritless allegations.  It should be

 2    balanced with the strong preference for arbitration that's

 3    in the FAA that our courts have long recognized as well as

 4    the ability of parties to contract.

 5            Thank you, Your Honor.

 6            THE COURT:  Thank you, Ms. Drenosky.

 7            Counsel.

 8            MR. AVCOLLIE:  Good morning, Your Honor.

 9            This is not a stray remarks case.  This is not a

10    case of offensive but inactionable rudeness in the

11    workplace.  Contrary to the characterization of the

12    defendants, the allegations here are very serious and very

13    sexual in nature.

14            First, I want to clear up one thing.  The

15    plaintiff's sworn affidavit and its exhibits can be

16    disregarded by the Court.  This isn't a summary judgment

17    motion and the pleadings themselves and the inferences

18    that must be drawn in favor of the plaintiff are more than

19    sufficient to sustain the plaintiff's position here.  We

20    did not rely --

21            THE COURT:  Just to be clear, you agree I should

22    not look at the affidavit?

23            MR. AVCOLLIE:  No, you should not look at the

24    affidavit.  There's no reason to, Your Honor.  The

25    pleadings -- what the Court should do is read carefully

1    what's actually pled, not what the defendants are

2    characterizing or mischaracterizing.

3            THE COURT:  Why did you file this affidavit and

4    have me read these dozens and dozens of pages if you don't

5    want me to rely on it?

6            MR. AVCOLLIE:  Well, Your Honor, I wasn't aware

7    that the defendant would object that it wasn't integral to

8    the complaint.  I believe it was integral.  However, it's

9    not necessary to prove the plaintiff's point.  So I don't

10   want to belabor --

11           THE COURT:  How is it integral to the complaint

12   in the sense that if that could happen any time, right,

13   imagine a defendant moves to dismiss saying the complaint

14   doesn't allege enough, and if the other side could cure it

15   simply by having their client write up a long affidavit

16   like you did, that would really defeat the purpose of

17   requiring the complaint itself to allege the necessary

18   facts, right?

19           MR. AVCOLLIE:  Your point is well-taken,

20   Your Honor.  The affidavit long predates the complaint.

21   And the facts in the complaint were derived directly from

22   the affidavit.  And because the defendants on their moving

23   papers were, in our view, mischaracterizing the

24   allegations, I thought it was a horse's mouth type of

25   situation.  This is where the facts came from, this

1   document, this affidavit.  We felt it was integral and the

2   Court could be informed by it.  When the defendant

3   objected in the manner they did, we concede that it need

4   not be relied upon.

5          THE COURT:  All right.

6          MR. AVCOLLIE:  Thank you, Your Honor.

7          So, in order to find for the defendant on this

8   motion, the Court is going to have to completely disregard

9   explicit facts pled in the complaint and find

10  contradictory facts which the defendant is supplying here.

11  A fair and generous reading of the complaint which must be

12  what is granted, the plaintiff here on a motion to dismiss

13  will show that, first of all, the term "tossing the salad"

14  has been completely misrepresented in the defendant's

15  motion.  I'd like to start with that.

16         THE COURT:  Let me maybe cut to the chase on

17  this.  Let's say I credit you that "tossing the salad" has

18  a sexual connotation to it.  Let's say I agree with that.

19         MR. AVCOLLIE:  Yes.

20         THE COURT:  My concern is still just the very

21  limited number of times that these kinds of comments were

22  made by Mr. Pautz to your client over a period of many

23  months.  I had a hard time seeing how these kinds of

24  statements rose to the very demanding level that a

25  sexually hostile work environment claim requires, that it

1  be severe and pervasive in a manner that actually alters

2  the terms of the working environment.  So it's

3  something -- it's much more than these are offensive,

4  boorish, inappropriate comments.  Probably people could

5  well agree that they are, okay?  But it seems to me the

6  standard is really quite a bit higher in terms of the

7  cases I've seen and what the case law seems to require.

8  That's what I'm troubled by.

9          MR. AVCOLLIE:  Okay, Your Honor.  I'd like to

10  address that, if I may.

11          THE COURT:  Sure.

12          MR. AVCOLLIE:  The defendant here ignores the

13  fact that the complaint details specific allegations that

14  the sexual jokes, innuendo, and outrageous humiliating

15  comments by Mr. Pautz were frequent.  It says in the

16  complaint, paragraphs 16, 17, 18, and 112, the sexual

17  jokes and innuendo from Mr. Pautz were both frequent and

18  that they conformed a consistent pattern.  The fact that

19  there are several episodes specifically denoted in the

20  complaint simply means that those are the ones that

21  Mr. Malkani was able to recount with enough specificity to

22  describe in the complaint.  He states that in the

23  complaint in black and white that the salad tossing joke

24  was a frequent source of amusement for Mr. Pautz.  So it

25  was frequent.  That's what the pleading says.  The

1    inference to be a drawn from that is --

2           THE COURT:  Is the argument, then, that you

3    don't need to get into the particular details of comments,

4    it's just enough to say it's frequent?

5           MR. AVCOLLIE:  Well, I would cite that in *Pucino*

6    *v. Verizon Communications*, Second Circuit 2010, it states

7    that in the same type of case where the plaintiff said

8    that she was continuously harassed, so a general

9    allegation like frequently harassed.  And then she adds

10   one or two incidents where she described the harassment

11   but said she couldn't recall the rest, that's a summary

12   judgment case, but the court found to prevail plaintiff

13   need not recount each and every instance of abuse to show

14   pervasiveness.  So pervasiveness was found on a summary

15   judgment motion where there were general allegations of

16   constant harassment and then a few specific examples.

17   That's permissible.  That meets the standard.

18          THE COURT:  Don't you have to find that the

19   specific examples themselves rise to the level?

20          MR. AVCOLLIE:  Yes.  And we believe in

21   examination of the term "tossing the salad" and further we

22   ask the Court to take judicial notice of the definition of

23   it, and we can offer that at any point under Federal

24   Rule 201 in the proceedings to ask for judicial notice of

25   an adjudicatory fact.  And we think that "tossing the

1   salad" is an adjudicatory fact on this motion.

2           We respectfully offer to the Court, which is

3   permissible under Rule 201, that the Urban Dictionary

4   which is a well-regarded dictionary, we have 13 cases

5   where in the Second Circuit courts have relied on the

6   Urban Dictionary as an authoritative source for slang

7   terminology.  So these other 13 courts have found Urban

8   Dictionary definitions acceptable.  We offer the Court, if

9   it's acceptable, the first five pages of the definitions

10  of "tossing the salad" from the Urban Dictionary

11  www.urbandictionary.com, and we ask the Court to take

12  judicial notice.  We state that the term "tossing the

13  salad," if it's sanitized and devoid of any sexual

14  content, yes, the allegations look thin.  But it can't be

15  sanitized.  It says right in the complaint that

16  Mr. Malkani was ridiculed repeatedly with sexual jokes and

17  commentary.  These are examples of them, "tossing the

18  salad."

19          Furthermore, it wasn't "tossing word salad."  It

20  was on the first time that it's alleged that Mr. Pautz

21  said it, he said, "You're going to have to toss some word

22  salad on this, Malkani."  That's a quote from the

23  complaint.  Clearly, it's a jest in the way it's

24  portrayed.  Secondly, when he went on to continue the

25  joke, Mr. Pautz said, "How's the salad tossing going with

1    James?  You guys getting it done?"  That's a sarcastic --

2    that's a joke.  That's the inference that needs to be

3    drawn from that pleading.  He's making fun of Mr. Malkani

4    suggesting a homosexual act of anilingus with his

5    colleague James Derr.  That not only has offensive and

6    humiliating implications for a grown adult in the

7    workplace, but it also has homoerotic implications that

8    implicate sex and gender because it touches on homosexual

9    activity.

10              THE COURT:  What would you say is the best case

11   in your favor on the issue of whether the conduct that's

12   been alleged here is so severe and pervasive that it meets

13   the requirements?

14              MR. AVCOLLIE:  I'm glad you asked that,

15   Your Honor.  I have several cases that I'd like to -- that

16   I think are apposite.  And I would also state that the

17   cases cited by the defendant in their brief and in their

18   argument, including *Mills v. S. Conn. State Univ.*, *Quinn*

19   *v. Green Tree Credit Corp.*, *Mendez-Nouel v. Gucci Am.*,

20   *McKenna v. VCS Group*, and others do not come close to the

21   fact pattern that is appropriate here.  The Court should

22   be looking at Second Circuit cases -- these are all Second

23   Circuit -- *Pucino v. Verizon Communications*, that's Second

24   Circuit 2010; *Kaytor v. Electric Boat Corporation*,

25   Second Circuit 2010; *Howley v. Town of Stratford* -- that's

1    a big one -- Second Circuit 2000; *Torres v. Pisano*,

2    Second Circuit 1997; and *Feingold v. New York*,

3    Second Circuit 2004.

4           In *Feingold*, the court was particularly careful

5    to note that the standard for hostile work environment

6    should not be placed too high, the bar should not be

7    placed too high.  The court goes on to opine about -- it

8    says something to the effect that a litigant, a plaintiff

9    need not be Jackie Robinson enduring intolerable

10   humiliation every day and ignoring it in order to have an

11   actionable claim.  That would make the standard so lax

12   that except in the most egregious cases the employer would

13   have no liability.  That's not what the standard is.  The

14   standard is lower.

15          Furthermore, the Second Circuit in these cases

16   has held that a combination -- the plaintiff need not

17   plead an action severe enough to meet the standard or

18   pervasive enough.  It can be a combination of both.  This

19   is, again, the Pucino v. -- I'm sorry -- *Pucino v. Verizon*

20   *Communications*, yes.  *Pucino v. Verizon Communications*.

21   It stands for the proposition that a combination here --

22   and that's what we're looking at here: a combination.

23   We've got a number of things here.  One is the "tossing

24   the salad" remark.  We think that's egregious enough

25   because it implicates oral sex.  In *Howley v. Stratford*,

1    the convincing -- the dead ringer fact was that the -- and

2    the single incident of verbal assault that took place, the

3    defendant implied or stated, actually, that the plaintiff

4    had gotten her job as a fire lieutenant by performing oral

5    sex.  Here, we're talking about a similar thing.

6    Mr. Malkani was told part of his job was to perform oral

7    sex with James Derr as a joke, as a form of ridicule and

8    humiliation.

9          Furthermore, the entire complaint is where the

10   context comes from.  And we think it's misrepresented by

11   the defendant, frankly, Your Honor, with respect.  The

12   entire complaint denotes a pattern of humiliation towards

13   Mr. Malkani.  That was the goal of Mr. Pautz in 2023:

14   humiliation.

15         And the case law is clear from the Second

16   Circuit, Your Honor, that when there is sexual conduct and

17   then harassment that is not sexual on its face, all of the

18   conduct can be considered as part of the hostile

19   environment.  That includes the ageist remarks.  It

20   includes the stated preference for female executives.  It

21   includes the stripping Mr. Malkani in a humiliating and

22   public fashion from his job duties and telling him to

23   report to his junior colleague who was a woman if he wants

24   to get any work done, if he wants to know what his

25   assignment is, he has no more duties.  All of this is in

1    the context of Mr. Pautz favoring female executives,

2    selecting Mr. Malkani for homoerotic ridicule, homoerotic

3    tinge ridicule, and sexual remarks also about female

4    colleagues.

5            So we think the environment is quite hostile and

6    all of these allegations are relevant.

7            THE COURT:  I guess your argument, then, is to

8    the extent that there was age-based discriminatory conduct

9    against Mr. Malkani, you believe that that supports the

10   sexually hostile work environment claim?

11           MR. AVCOLLIE:  Yes, Your Honor.  We believe that

12   it's humiliating.  The inference to be drawn is Mr. Pautz

13   was on a campaign of humiliating Mr. Malkani.  And he

14   humiliated him for an entire year in any way he could.

15           I'd further like to make a point about the

16   alleged hug.  And one of the cases was cited, another

17   case, *Mills v. S. Conn. State Univ.*, by the defendant

18   where a hug by a colleague was not considered sexual

19   harassment.  The complaint specifically pleads --

20   Mr. Malkani's complaint specifically pleads that the bear

21   hug that was inflicted on him by Mr. Pautz was sexually

22   suggestive and intimidating.  Sexually suggestive and

23   intimidating.  It was a man-on-man hug that lasted too

24   long.  And the defendant only -- I'm sorry, I'm losing the

25   cite here.

```
 1           THE COURT:  So I recall the allegation was it
 2    was a moment too long.
 3           MR. AVCOLLIE:  That's what they say.  You have
 4    to read the next paragraph, Your Honor.  This is why we
 5    say if the complaint is actually read and not just
 6    cherrypicked, the fact pattern will be clear.
 7           THE COURT:  What's the next paragraph?
 8           MR. AVCOLLIE:  Let me just find it here,
 9    Your Honor.  I have it cited here.  If you could bear with
10    me one moment, Your Honor.  My apologies.
11           I believe it is 143 -- 142 and 143.
12           THE COURT:  I have it here.  I see the
13    reference.  The complaint itself says that the bear hug
14    lasted a moment too long.
15           MR. AVCOLLIE:  And then it says, the next
16    paragraph, Your Honor.
17           THE COURT:  I can read that.  I won't do an
18    out-loud reading.
19           MR. AVCOLLIE:  The next paragraph, I can tell
20    you in sum what it says -- I can't think of the number --
21    it says that the hug was sexually suggestive.  It's right
22    there in black and white.  Sexually suggestive, the hug.
23           This is a hug between a man -- this hug was
24    given by a man who did nothing but intimidate and torture
25    Mr. Malkani mentally for an entire year, or nine months at
```

1    that point of the hug.  So the fact that he was hugging

2    him at all is suspicious.  The inference is it's

3    suspicious.  He goes to greet this man that he's been the

4    tormenter of and finally has an in-person meeting with

5    him, and he gets this long sexual hug that intimidated and

6    scared Mr. Malkani.  And he spent the rest of the meeting

7    frightened for his physical safety.

8           The case law is clear that even slightly boorish

9    remarks don't rise to the level of severe and pervasive.

10   If they are coupled with physical intimidation, that can

11   bring the -- that can meet the standard of severity.  And

12   in this case we say that sexually toned bear hug which was

13   also physically intimidating -- Mr. Pautz was a large man,

14   a big man, 6'4", 250.  That intimidated Mr. Malkani with

15   physically handling him, that's what it says in the

16   complaint.  And that that raises -- that relates to the

17   other comments, the "tossing the salad," the talking about

18   have sex with junior female colleagues, the ridiculing

19   him, telling him he can to whatever he wants with James as

20   if he had some sexual agenda he wanted to continue with

21   James.  All of this comes into context with that.  We

22   believe that there's much more to this than the defendants

23   are presenting to the Court.

24           THE COURT:  Can I ask you this?  Unless you have

25   more to say about the adequacy of Counts Three and Four.

1              If the Court were to conclude that Counts Three

2    and Four do not on their own terms plausibly allege a

3    claim for sexually hostile work environment, would the

4    proper course of action then be for the Court to remit the

5    rest of the claims to arbitration?

6              MR. AVCOLLIE:  Well, we also assert, Your Honor,

7    that there are claims of retaliation, hostile environment,

8    although not specifically labeled as such, that are

9    implied in the pleadings and should be construed by the

10   Court.  It's in our brief.

11             THE COURT:  I saw that.

12             MR. AVCOLLIE:  And I'd like to point out

13   something about that.  The counterargument to that from

14   the defendants in their reply is that the protected

15   activity did not occur until December of 2023.  The

16   problem is that's wrong.  The complaint clearly states

17   that Mr. Malkani made reports to Mr. James -- or

18   Mr. Wartinbee, I forget his first name, but Mr. Wartinbee

19   in early 2023, January of 2023, on January 31st.  And that

20   he received immediate retaliation from that report about

21   Mr. Pautz.  He therefore -- the hostile environment that

22   ensued can be construed as retaliatory after his first

23   protected complaint.  That's what the pleadings said.

24   Whether it's going to be hard to prove or not is a

25   question of weighing facts, which is not appropriate on a

1   motion to dismiss.

2            THE COURT:  I understand that.

3            It would help me to understand what are the

4   protected activities that you are relying on as the basis

5   for your retaliation claims.

6            MR. AVCOLLIE:  The protected activities include

7   all of the reports that Mr. Malkani made.

8            One was to Mr. Wartinbee in early 2023,

9   January 31, 2023.  That's in the complaint.  And the

10  retaliation that resulted from it.

11           Second, was a complaint to a human resources

12  manager in October of 2023, also a complaint rejected.

13  That was protected activity.

14           The only one that the defendants will

15  acknowledge is the December 2023 complaint that was

16  finally accepted or recognized by the defendants.

17           But we say all three of those complaints are

18  protected activity.

19           Now, I think the defense has it wrong that --

20  you asked about if the sexual harassment claims fail, do

21  the retaliation claims fail also?  No, they don't.  Even

22  if there's no sexual harassment, if you are retaliated

23  against for complaining about sexual harassment, it

24  doesn't depend on the sexual harassment being validated.

25  If you can prove that the retaliatory animus and the

1   conduct that resulted, the adverse reactions, came from

2   that complaint, it doesn't matter if the complaint itself

3   was valid or not.

4           THE COURT:  There's a further requirement,

5   though, that the plaintiff had a good faith basis for the

6   allegation in the first place, right, even if it doesn't

7   turn out to be true.  Right?

8           MR. AVCOLLIE:  I'm not sure about the good faith

9   standard, Your Honor.  I don't know if it does require it.

10  I'm not sure it does, Your Honor.

11          THE COURT:  So, your sense is a plaintiff could

12  completely fabricate an allegation against a supervisor of

13  abusive conduct and then if there was retaliation on the

14  basis of a knowingly fabricated claim of abusive conduct,

15  that would still be actionable by the plaintiff?

16          MR. AVCOLLIE:  I think so.  The language of the

17  statute I don't think sets forth any sort of requirement.

18  It simply says for reporting, retaliation is illegal for

19  reporting any sexual harassment or discrimination under

20  this title.  I'm pretty sure that's the language,

21  Your Honor.  I don't want to misrepresent.  But I don't

22  think it says only a good faith report will be considered

23  retaliation.  There may be case law to that effect, but

24  I'm not aware of it, Your Honor.

25          THE COURT:  There may be.  Maybe that's

1    something I can look at further.

2              MR. AVCOLLIE:  And we can certainly offer

3    briefing if Your Honor prefers or if it would help

4    Your Honor.

5              THE COURT:  And so you've identified three

6    instances of protected activity from January of 2023,

7    October of 2023, and December 2023.

8              MR. AVCOLLIE:  Yes, Your Honor.

9              THE COURT:  That's it, right, in terms of the

10   instances of protected activity?

11             MR. AVCOLLIE:  Yes, Your Honor.

12             THE COURT:  And for each of those three

13   instances, was there a complaint by your client about

14   sexual harassment as distinct from age discrimination or

15   even a gender discrimination claim distinct from sexual

16   harassment?

17             MR. AVCOLLIE:  Well, as the first two -- as the

18   complaint states, Your Honor, the first two complaints

19   that the defendant disregards -- and this is probably why

20   they disregard them -- the plaintiff was cut off and not

21   permitted to continue his complaints because when he

22   started to raise them, he was immediately shut down and

23   told he can't -- you know, don't go there, et cetera.

24   That's bad behavior for an employer.

25             THE COURT:  The plaintiff, was he forbidden from

1    writing something, submitting something in writing?

2              MR. AVCOLLIE:  He was told by his superiors that

3    he should not pursue these complaints immediately by

4    Mr. Wartinbee.  And Mr. Wartinbee refused to meet with him

5    after that.  The plaintiff was understandably afraid.

6    Gartner, Inc. itself, you know, they're a consulting firm

7    that consults with HR matters, they know that most

8    complaints of harassment are not reported for fear of

9    retaliation.  Once Mr. Malkani was shut down on two

10   specific complaints, he tried to bring this outrageous

11   behavior to his superior's attention and was told don't go

12   there, you're going to have to put up with this was what

13   he was told, in essence -- and the complaint states

14   this -- he didn't know what to do.  But we allege those

15   are protected activities.

16             THE COURT:  The first two instances he's cut off

17   before he can bring out details of sexual harassment; is

18   that right?

19             MR. AVCOLLIE:  Correct, Your Honor.

20             THE COURT:  The third instance, what does he say

21   there about sexual harassment by Mr. Pautz?

22             MR. AVCOLLIE:  The third incident, he gives more

23   details about all the harassment.  He gives the details of

24   the sexual comments and the ageist comments.

25             THE COURT:  Is that spelled out in the

1    complaint, in terms of what he said?

2            MR. AVCOLLIE:  I'm not sure if the contents of

3    the report are, but I believe in general terms that he

4    disclosed all of the abuse.

5            THE COURT:  I see.  Okay.

6            MR. AVCOLLIE:  At that point.

7            THE COURT:  What else?

8            MR. AVCOLLIE:  Okay.  Further, we do insist that

9    the *Carr v. New York Transit Authority*, Second Circuit

10   2023, applies here and that the materially adverse

11   standard should be applied, not the severe and pervasive

12   standard.  Again, as Your Honor noted for us, that there's

13   retaliation counts in I believe Seven and Eight,

14   Counts Seven and Eight that are related to, that are

15   connected to the Three and Four counts of hostile

16   environment.  We believe the entire complaint states a

17   valid claim for retaliation/hostile environment.  Again,

18   assuming that the protected activity is protected activity

19   that we allege against the January 31, 2023, report is

20   protected activity, the harassment that follows is

21   perceived as retaliatory.

22           THE COURT:  I've looked at the *Carr* case and I

23   have your argument on that.

24           MR. AVCOLLIE:  We assert here again that that

25   standard applies and not the severe and pervasive

1    standard.  We think it's an even easier get than the

2    defendants.  But we believe we can meet the standard,

3    either standard, Your Honor.

4            So, finally, I would say that it's the law of

5    this circuit that no motion to dismiss under Rule 12(b)(6)

6    should be granted unless it appears beyond doubt that the

7    plaintiff can prove no set of facts in support of his

8    claim which would entitle him to relief.

9            THE COURT:  Is that the *Iqbal* standard?  Or are

10   you referring to *Conley*?

11           MR. AVCOLLIE:  That's *Conley v. Gibson*, U.S.

12   Supreme Court.

13           THE COURT:  Do you know if the standard has

14   changed since *Conley* was decided in light of the *Iqbal*

15   case?

16           MR. AVCOLLIE:  I don't believe it has,

17   Your Honor.  I can't say authoritatively.

18           The Court is required to read the complaint with

19   great generosity on a motion to dismiss.  All facts and

20   inferences reasonably deducible therefrom are to be

21   construed in favor of the plaintiff.  If that is done here

22   and that complaint is looked at with that generosity and

23   that deference to the plaintiff's claims, the motion is

24   denied every time.

25               In this case the pleadings and all the

1   reasonably deducible inferences to be drawn therefrom cast

2   a great deal of doubt on the proposition that the

3   plaintiff can prove no set of facts on which relief can be

4   granted.  That is clearly in doubt on these pleadings.

5           Although it should deny the defendant's motion

6   to dismiss, in the event the Court does dismiss part of

7   this complaint, we would ask the Court to do so without

8   prejudice to amending the complaint to include a few more

9   details because that's really what we're talking about

10  here.  We're asking the Court to draw a few inferences

11  here that are logical and that relate to the complaint,

12  but at most, you know, the complaint is lacking at most a

13  few minor details that are not specifically pled.  That's

14  the worst way you can look at the complaint, in our view.

15  There's a few things that could be added.  We would ask

16  that be done without prejudice.

17          If the Court denies the motion, we believe that

18  the entire case should be adjudicated in district court

19  and not sent piecemeal, as the defendants urge, and that

20  the *Johnson v. Everyrealm, Inc.* opinion of

21  Judge Engelmayer should be followed and that there

22  shouldn't be created a split in the Second Circuit

23  regarding the application of the EFAA.

24          Both the defendants and the plaintiff have

25  quoted *Oncale v. Sundowner* for the proposition that the

1    Court should carefully examine the social context

2    surrounding this case.  Both parties have cited it.  So

3    what does that mean?  The social context is Corporate

4    America 2023.  We believe that considering the social

5    context here and what is appropriate and what the

6    community standards are.  Okay, what would a reasonable

7    person working at Gartner group as an executive in a top

8    company expect for behavior and treatment?  What is

9    reasonable to expect?  We believe any consideration of

10   this context is going to result in a ruling for

11   Mr. Malkani.  If indeed there was ever a time when a

12   supervisor, a high-level vice president -- high-level vice

13   president.  We're not talking about a guy in a loading

14   dock at an Amazon fulfillment center, Your Honor; we're

15   talking about the executive suites of Gartner, Inc.  If

16   there was a time when such a person could degrade a

17   subordinate by telling him to go have anilingus with his

18   male colleague and have that be glossed over as boorish

19   conduct or stray remarks, that time is long passed,

20   Your Honor.

21            We believe that the conduct at issue here is

22   obscene, abhorrent, and not permitted under Title VII or

23   the Connecticut Fair Employment Practices Act.

24            Thank you, Your Honor.

25            THE COURT:  Thank you.

1          Any rebuttal?

2          MS. DRENOSKY:  Thank you, Your Honor.

3          First, we'd like to address the standard here.

4          As of the case *Ashcroft v. Iqbal* in 2009,

5   there's a plausibility standard that requires more than a

6   sheer possibility the defendant has acted unlawfully.  And

7   threadbare recitals of the elements of a cause of action

8   supported by mere conclusory statements, which we've

9   argued is what we have here, do not suffice.

10         With respect to the argument that the Court

11  should look at the totality of the allegations here, so

12  there are allegations of age discrimination, comments

13  relating to that, comments about other colleagues, those

14  are things the Court can look at in determining a hostile

15  work environment, but they all need to come back to, at

16  core, there being some allegations of conduct based on the

17  protected characteristic.

18         So pointing to the cases that plaintiff cites in

19  his brief in support of this argument, for instance, in

20  *Cruz v. Coach Stores*, the alleged conduct there was more

21  frequent and severe and it also had allegations that

22  themselves related to the protected characteristic.  So in

23  *Cruz*, for instance, there were comments to other minority

24  Hispanic employees that could support the plaintiff's

25  claim that he was discriminated against based on race as

1  an African American.  But there were allegations that the

2  supervisor there had used racial slurs specifically

3  directed at African Americans.  So using the N-word,

4  saying things directly related to his race as well.  So

5  those are the types of cases where the Court can look at

6  other things that will come in to the totality of the

7  circumstances and looking at everything for evaluating a

8  hostile work environment, but it still has to come back to

9  that main point of what is the protected characteristic.

10            The other case cited by the plaintiff in their

11  brief, *Daniel v. T&M Prot. Res.*, in that case the court

12  said the plaintiff can rely upon facially neutral conduct

13  to bolster a harassment claim when the same individual

14  engaged in multiple acts of harassment, some overtly based

15  on a protected characteristic.  So it has to come back to

16  that point.

17            And here, to respond to a couple of the specific

18  points, with respect to the hug allegations that this hug

19  lasted a moment too long, there are a myriad of cases that

20  say that one hug that someone finds uncomfortable is not

21  enough to establish a hostile work environment claim.  The

22  additional allegation here is at paragraph 144.  And

23  Mr. Malkani alleges that his space was invaded in an

24  overly intimate way that felt sexually suggestive in the

25  context of Mr. Pautz's body language which plaintiff

1    observed and felt during this long, awkward embrace.  So

2    he's alleging that subjectively he felt that that was

3    inappropriate.  But that wouldn't meet the reasonable

4    person standard as alleged that objectively someone would

5    find that, again, so offensive that it altered the

6    condition of their employment.  So that's where the focus

7    should be.  We're confident here that if the Court does

8    read the entire complaint in its entirety, it will see

9    that it simply does not allege severe and pervasive

10    conduct that meets that high standard.

11        I would also like to point out there's several

12    cases that plaintiff has referred to that have been

13    decided in New York as the district courts in New York

14    seem to have evaluated some of these issues more recently.

15    Several of those cases deal with New York state law and

16    statute which has a lower burden for establishing claims

17    of hostile work environment and they don't need to meet

18    that severe and pervasive standard.  So I would just

19    caution the Court in evaluating the cases to understand

20    that it's a lower burden there.

21        And just additionally, plaintiff argues here on

22    the retaliation that he suffered a hostile work

23    environment as a result of submitting some sort of

24    complaint.  That's a little bit different than what other

25    cases have addressed which is saying I was terminated

1  because I complained about sexual harassment.  Here, our

2  argument is that in the complaint there's no report of

3  anything until December of 2023.  The other two

4  allegations that plaintiff points to say I was going to

5  complain but I didn't.  That's simply not enough to

6  establish any sort of protected activity, let alone

7  something based on sexual harassment.  And when he finally

8  does complain in December 2023, the end of his employment

9  was a few weeks later.  So to say that somehow between

10  that date and the end of his employment he suffered such a

11  high burden of hostile work environment simply is

12  nonsensical, in our view.

13          So, Your Honor, we are, again, happy to brief

14  the retaliation issue further.  If the Court has no

15  further questions, we rest on our briefing.

16          THE COURT:  I don't at this time.

17          I thank counsel for both sides for very able

18  arguments today.

19          I think what I'm going to do is enter a

20  supplemental briefing order.  I'd like to go back and look

21  at what we've talked about today.  I won't try to tell you

22  exactly what I would wish for supplement briefing.  At a

23  minimum, I think it will address whether the two

24  retaliation counts that refer explicitly to harassment --

25  I believe those are Counts Eight and Nine -- themselves

1    establish plausible grounds for relief as to a retaliation

2    claim with respect to sexual harassment, not with respect

3    to other parts of the case.  I think I have to know the

4    answer to that in part to undertake the inquiry that I

5    need to undertake in terms of which claims may be

6    ultimately arbitrable in the case.

7         I'll also allow the parties, to the extent that

8    they believe there's additional case authority -- some of

9    the cases have come out today for the first time.  It

10   always helps me to get those in advance of argument.  But

11   to the extent I haven't received those in advance of

12   argument, I want to give you an opportunity to go ahead

13   and submit any additional case authority that you think I

14   should be looking at as well as, from plaintiff's

15   perspective, I think you wanted the Court to take judicial

16   notice of certain items.  So I would request that those

17   items for which you want the Court to take judicial

18   notice, that you make a filing of that, file on the

19   docket, so that obviously there's an opportunity for the

20   other side to respond about whether it's properly

21   judicially noticeable.  I'll lay this all out more clearly

22   in a docket order that hopefully will enter later today at

23   some point in time, and ask for fairly expedited briefing

24   on these matters so we can keep the case moving along.

25         Is there anything else for the Court to take up

1    at this time?

2            MS. DRENOSKY:  No, Your Honor.

3            MR. AVCOLLIE:  Not from the plaintiff.

4            THE COURT:  Thank you for traveling in this

5    morning.  We'll stand in recess.

6                    (Proceedings adjourned at 9:11 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    C E R T I F I C A T E

4

5           RE: ROBERT MALKANI v. GARTNER, INC.
                    No. 3:24CV1009(JAM)

6

7           I, Diana Huntington, RDR, CRR, Official Court

8   Reporter for the United States District Court for the

9   District of Connecticut, do hereby certify that the

10  foregoing pages 1 through 39 are a true and accurate

11  transcription of my shorthand notes taken in the

12  aforementioned matter to the best of my skill and ability.

13

14

15

16

17                    _____
                              /s/

18                 DIANA HUNTINGTON, RDR, CRR
                      Official Court Reporter
19                 United States District Court
                   141 Church Street, Room 147
20                 New Haven, Connecticut 06510
                         (860) 463-3180
21

22

23

24

25